**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 13 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JOSEPH F. FRANKL,* Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, <br><br> Petitioner - Appellee, <br><br> v. <br><br> HTH CORPORATION; KOA MANAGEMENT, LLC, DBA Pacific Beach Hotel; PACIFIC BEACH CORPORATION, <br><br> Respondents - Appellants. | No. 10-15984 <br><br> D.C. No. 1:10-cv-00014-JMS-LEK <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted February 15, 2011
Honolulu, Hawaii

Filed July 13, 2011

Before: TASHIMA, W. FLETCHER, and BERZON, Circuit Judges.

---

*Joseph F. Frankl is substituted for his predecessor Joseph P. Norelli, as Regional Director of Region 20 of the National Labor Relations Board, pursuant to

(continued...)

Opinion by Judge BERZON, Circuit Judge:

This appeal of an injunction issued pursuant to § 10(j), 29 U.S.C. § 160(j), of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, (the "NLRA" or the "Act"), raises two questions, one difficult, the other relatively straightforward.

The straightforward question is whether the injunction should be affirmed on its merits. We have little difficulty concurring in the District Court's assessment that the National Labor Relations Board (the "Board" or the "NLRB") is likely to determine, and be affirmed by this Court in so determining, that appellants (the "Hotel") engaged in violations of § 8(a)(1), (3) and (5) of the Act by refusing to bargain in good faith and excluding five union activists from the workforce. The District Court likewise did not abuse its discretion in concluding that the other requisites for § 10(j) relief were met.

The somewhat more difficult question is the logically prior one of whether the District Court had the power to issue the injunction. In 2007, the Board assigned the authority to approve § 10(j) petitions to the General Counsel of the Board. *See* Minute of Board Action, Dec. 20, 2007. Pursuant to this delegation, the General Counsel approved the filing of the instant § 10(j) petition. The Hotel

---

*(...continued)
Fed. R. App. 43(c)(2).

argues that the Act requires that petitions for § 10(j) relief be individually approved by the Board before they are filed with a district court. Because the Regional Director did not obtain such approval, the Hotel argues, he did not have authority to petition for the injunction, and the District Court was without the power to grant it. Like all the federal courts of appeals to have addressed the question, we disagree. *See Osthus v. Whitesell Corp.*, No. 09-3209, —F.3d—, 2011 WL 1517949, at *2 (8th Cir. Apr. 22, 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 851-52 (5th Cir. 2010); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 539-40 (4th Cir. 2009).

## I. BACKGROUND

When the General Counsel of the National Labor Relations Board issues a complaint alleging an unfair labor practice and commences proceedings before the Board, it takes considerable time—sometimes years—for the administrative process to conclude. But "[t]ime is usually of the essence [in labor disputes]." *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 n.3 (9th Cir. 1994) (en banc) (quoting S. Rep. No. 80-105, at 8 (1947) (second alteration in original)). As a result of "the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals . . . [i]t [may be] possible for persons violating the act to accomplish their unlawful objective before being placed

3

under any legal restraint and thereby to make it impossible or not feasible [for the Board] to restore . . . the status quo." *Id.* (quoting S. Rep. No. 80-105, at 27 (1947).

To remedy this problem, Congress added § 10(j) to the NLRA, as part of a comprehensive labor law reform in 1947. *See* Labor-Management Relations Act, 1947 (the "Taft-Hartley Act"), Pub. L. No. 80-101, § 101, 61 Stat. 136, 149, *codified at* 29 U.S.C. § 160(j). Section 10(j) provides:

> (j) Injunctions
>
> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j). The purpose of a § 10(j) injunction is "to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes" an unfair labor practice complaint. *Miller*, 19 F.3d at 459-60.

The circumstances leading to the application for a § 10(j) injunction in this case are as follows: In 2002, the International Longshore and Warehouse Union, Local 142 (the "Union") began to organize employees at the Pacific Beach Hotel in

4

Waikiki, Honolulu.[1]  A representation election was held in July, 2002, but the Board set it aside, finding that the Hotel had "engaged in objectionable conduct by coercively interrogating employees and maintaining an overly broad no-solicitation policy." *HTH Corp.*, 342 N.L.R.B. 372, 374 (2004).  After a second election, preceding which, the Board found, the Hotel again engaged in objectionable conduct, *see generally Pac. Beach Corp.*, 344 N.L.R.B. 1160 (2005), the Union was certified, prevailing by a one-vote margin.

Bargaining between the Union and the Hotel did not go well.  Between January 22, 2007 and August 29, 2008, the Union filed numerous unfair labor practice charges with the Regional Director of Region 20 of the Board (the "Regional Director" or the "Director").  The Director investigated the charges and issued an unfair labor practice complaint.

On September, 30 2009, after thirteen days of hearings, a Board Administrative Law Judge ("ALJ") determined that the Hotel had violated § 8(a)(1), (3) and (5) of the Act and recommended that the Board order the Hotel to cease and desist from various unfair labor practices and to take other remedial actions.  The

---

[1] We use the term "Hotel" to refer the facility itself as well as the three business entities, appellants here, that have owned and managed it.  Where the referent is not clear from context, we eschew the term.

Hotel filed extensive exceptions to the ALJ's ruling with the Board, and the Director filed limited ones. The case remains pending before the Board.

On January 7, 2010, the Director filed a petition in the District Court for injunctive relief under § 10(j) of the Act. In accordance with the Board's 2007 delegation of litigation authority, the filing of the petition was approved by the Board's General Counsel but not by the members of the Board itself. The Hotel opposed the petition on its merits but also moved to dismiss the complaint for lack of subject-matter jurisdiction, contending that the Director's failure to obtain the Board's approval to file the § 10(j) petition deprived the District Court of jurisdiction. Siding with the Director, the District Court issued an injunction requiring the Hotel to bargain with the Union, to reinstate certain discharged employees, to rescind unilateral changes to the bargaining unit members' terms and conditions of employment, and to take various other remedial measures.

The Hotel appealed. On June 14, 2011, while this appeal was pending, the Board issued its decision in the underlying action. *See HTH Corp.*, 356 N.L.R.B. No. 182 (2011). It affirmed the ALJ's rulings, findings, and conclusions, and it modified the ALJ's recommended remedies in respects not relevant here.[2]

---

[2]The Board modified the ALJ's order in two respects. First, in accord with its decision in *Ky. River Med. Ctr.*, 356 N.L.R.B. No. 8 (2010), the Board required

(continued...)

## II. MOOTNESS

Before turning to the substantive issues at stake in this case, we must first address the issue of mootness. A Section 10(j) proceeding, in which the Board seeks injunctive relief to protect the lawful status quo while litigation is pending, can become moot when the NLRB issues its decision in the underlying administrative proceeding. *See Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 453 (9th Cir. 1994). Here, however, the Board filed in the district court a motion for civil contempt on February 14, 2011–while the Hotel was subject to the District Court's injunction, after this appeal was filed, and before the Board issued its order. The original contempt motion sought both coercive and compensatory relief, including back pay for an employee allegedly terminated in violation of the injunction and the Board's attorneys' fees and costs incurred in connection with the contempt proceeding. After the Board issued its decision, the Director notified the District Court that he no longer sought coercive remedies and, receiving an extension of time to file an amended civil contempt motion, withdrew the original contempt motion. On July 8,

---

[2](...continued)
that back pay and other monetary awards be paid with interest compounded on a daily basis. Second, the Board modified the ALJ's order to provide for the posting of notice in accord with *J. Picini Flooring*, 356 N.L.R.B. No. 9 (2010).

2011, the Board filed an amended civil contempt motion seeking compensatory relief.

We hold that this appeal is not moot because its resolution is crucial to a pending claim for retrospective monetary relief sought by the Board against the Hotel in a civil contempt proceeding. *See Trans Int'l Airlines, Inc. v. Int'l Bhd. of Teamsters*, 650 F.2d 949, 955 (9th Cir. 1980). "Despite superseding events, an issue is not moot if there are present effects that are legally significant." *Jacobus v. Alaska*, 338 F.3d 1095, 1104 (9th Cir. 2003). The validity of a civil contempt adjudication turns on the legitimacy of the underlying injunction. *See, e.g.*, *Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1142-43 (9th Cir. 2003); *see also United States v. United Mine Workers*, 330 U.S. 258, 294-95 (1947). The legitimacy of the District Court's injunction, in turn, depends on whether the District Court abused its discretion in granting the Board's § 10(j) petition. It also depends on the antecedent question whether the Board has authority to assign § 10(j) decisions to the General Counsel.[3] Accordingly, we hold that neither the delegation issue nor the merits of the injunction are moot. *Cf. Trans Int'l Airlines*, 650 F.2d at 957 (holding that alternative grounds for the injunction underlying a

---

[3]Although a panel of three Board members issued the NLRB's final order, this circumstance does not affect the General Counsel's authority (or lack thereof) to commence the § 10(j) action.

contempt proceeding remained live on appeal and noting a reluctance to fragment an appeal into "live" and "moot" issues).

## III.  THE BOARD'S AUTHORITY TO ASSIGN § 10(j) DECISIONS TO THE GENERAL COUNSEL

The Hotel contends that each petition for relief under § 10(j) must be individually authorized by a quorum of NLRB members.  Because the particular petition in this case was not so authorized, the Hotel maintains, the petition was improperly before the District Court and should have been dismissed for want of subject-matter jurisdiction.

### A.

### 1.

The circumstances surrounding the 2007 delegation of litigation authority to the General Counsel here contested was described recently by the Supreme Court:

> As 2007 came to a close, the Board found itself with four members and one vacancy. It anticipated two more vacancies at the end of the year, when the recess appointments of Members Kirsanow and Walsh were set to expire, which would leave the Board with only two members—too few to meet the Board's quorum requirement.  The four sitting members decided to take action in an effort to preserve the Board's authority to function.  On December 20, 2007, the Board made two delegations of its authority, effective as of midnight December 28, 2007.  First, the Board delegated to the general counsel continuing authority to initiate and conduct litigation that would normally require case-by-case approval of the Board.  Second, the

9

> Board delegated "to Members Liebman, Schaumber and Kirsanow, as a three-member group, all of the Board's powers, in anticipation of the adjournment of the 1st Session of the 110th Congress."
>
> . . . .
>
> On December 31, 2007, Member Kirsanow's recess appointment expired. Thus, starting on January 1, 2008, Members Liebman and Schaumber became the only members of the Board.

*New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2638-39 (2010) (citations omitted). *New Process Steel* went on to consider the second of the two described delegations, holding that a three-member group with one vacancy could not exercise the powers of the Board. *Id.* at 2641-42. Section 3(b) of the Act authorizes delegations to three-member groups, 29 U.S.C. § 153(b), but, the Supreme Court reasoned, such a "delegee group ceases to exist once there are no longer three Board members to constitute the group." *New Process Steel*, 130 S. Ct. at 2642 n.4.

At the same time, *New Process Steel* expressly declined to discuss the legality of the Board's assignment of litigation authority to the General Counsel, the delegation challenged in this case. The Supreme Court explained:

> Our conclusion that the delegee group ceases to exist once there are no longer three Board members to constitute the group does not cast doubt on the prior delegations of authority to nongroup members, such as the regional directors or the general counsel. The latter implicates a separate question that our decision does not address.

10

*Id.* We now consider that "separate question," beginning with a brief survey of the relevant history.

2.

From 1935, when the NLRA was enacted, to 1947, the Board consisted of three members responsible for both the prosecution and the adjudication of all cases over which the Board had jurisdiction. *See* National Labor Relations Act, Pub. L. No. 74-198 (the "Wagner Act"), § 3(a), 49 Stat. 449, 451 (1935); *id.* § 10, 49 Stat. at 453-55; 2 JOHN HIGGINS, JR., THE DEVELOPING LABOR LAW 2656-57 (5th ed. 2006). In response to criticism that the Board's exercise of both prosecutorial and adjudicatory functions was improper, Congress established the position of General Counsel of the Board and assigned the General Counsel the Board's prosecutorial functions, as well as other roles. *See id.* at 2657; Taft-Hartley Act, § 101, 61 Stat. at 139, *codified at* 29 U.S.C. § 153(d). The Taft-Hartley Act also increased the membership of the Board to five. *Id.*, *codified at* 29 U.S.C. § 153(a). Section 3(d) of the Act now provides, in pertinent part:

> There shall be a General Counsel of the Board who shall be appointed by the President, by and with the advice and consent of the Senate, for a term of four years. The General Counsel of the Board shall exercise general supervision over all attorneys employed by the Board (other than administrative law judges and legal assistants to Board members) and over the officers and employees in the regional offices. He shall have final authority, on behalf of the Board, in respect of the

11

investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law.

29 U.S.C. § 153(d).

As a matter of the Board's historical practice, the General Counsel has not always sought case-specific approval before filing a § 10(j) petition. Immediately after the Taft-Hartley Act's passage, for instance, the General Counsel and the Board entered into a "memorandum of understanding" according to which the "General Counsel [was to] exercise full and final authority and responsibility on behalf of the Board for *initiating* and prosecuting injunction proceedings as provided for in Section[] 10(j)." *Evans v. Int'l Typographical Union*, 76 F. Supp. 881, 888 (S.D. Ind. 1948) (quoting the memorandum) (emphasis added); *see also* National Labor Relations Board—Procedures § 202.35, *reprinted in* 20 Labor Relations Reference Manual 3117-18 (1947) ("Whenever the *Regional Director* deems it advisable to seek temporary injunctive relief under Section 10(j) . . . the officer or Regional Attorney to whom the matter has been referred will make application for appropriate temporary relief . . . .") (emphasis added).

In 1950, however, the Board published a memorandum in the Federal Register "describ[ing] the statutory authority and set[ting] forth the prescribed duties and

authority of the General Counsel of the Board." Nat'l Lab. Rel. Bd., General Counsel—Description of Authority and Assignment of Responsibilities, 15 Fed. Reg. 6924, 6924 (Oct. 14, 1950) (the "1950 Memorandum"). That memorandum provided that "[o]n behalf of the Board, the General Counsel of the Board will[,] in full accordance with the directions of the Board, . . . initiate and prosecute injunction proceedings as provided in section 10(j) . . . *Provided, however*, That the General Counsel will initiate and conduct injunction proceedings under section 10(j) . . . only upon approval of the Board . . . ." *Id.* In other words, the 1950 Memorandum authorized the General Counsel to file § 10(j) petitions on the Board's behalf, but required him to seek case-specific authorization from the Board before filing them. The Board issued a new memorandum in 1955 containing an assignment of litigation authority to the General Counsel identical to that in the 1950 Memorandum. *See* Nat'l Lab. Rel. Bd., Authority and Assigned Responsibilities of General Counsel of National Labor Relations Board, 20 Fed. Reg. 2175, 2175 (April 6, 1955) (the "1955 Memorandum").[4] These two memoranda set forth what was the Board's standard,

---

[4] The 1950 Memorandum had been revoked in 1954, when the Board assigned litigation authority to its Associate General Counsel. *See* Nat'l Lab. Rel. Bd., Revocation of Statement of Description of Authority and Assignment of Responsibilities to the General Counsel, 19 Fed. Reg. 8830, 8831 (Dec. 21, 1954).

but not invariant,[5] practice until the 2007 delegation at issue in this case.   The

General Counsel's § 10(j) Manual describes that procedure in greater detail:

> After the Region [i.e., a regional office of the agency]
> determines that a case has merit and believes 10(j) proceedings are
> appropriate, the Region makes a recommendation in writing to the
> General Counsel, through the Injunction Litigation Branch (ILB) of
> the Division of Advice, as to whether it believes that Section 10(j)
> relief is warranted. . . .  If the General Counsel agrees that 10(j)
> proceedings should be sought, the Region's memorandum provides
> the foundation for the General Counsel's request for authorization
> from the Board.
> . . . .
> After the General Counsel reviews and signs ILB's cover
> memorandum to the Board, the entire case, including the Region's
> memorandum and attachments, is submitted to the Board. . . .  At this
> point, at the latest, the Region should immediately begin preparing
> papers to file in district court. . . .  If the Board authorizes Section
> 10(j) proceedings, the ILB will immediately notify the Region.

---

[5] The Board delegated generic § 10(j) authority to the General Counsel for a brief period in 2001 and 2002, *see* Nat'l Lab. Rel. Bd., Order Delegating Authority to the General Counsel Before Chairman Peter J. Hurtgen, and Members Wilma B. Liebman and Dennis P. Walsh, 66 Fed. Reg. 65998, 65998 (Dec. 21, 2001); *Kentov v. Point Blank Body Armor, Inc.*, 258 F. Supp. 2d 1325, 1327-28 (S.D. Fla. 2002).

In addition to this 2001 order, the Board has published amendments to the 1955 Memorandum in the Federal Register, but these amendments relate to parts of the memorandum that are of no relevance here.  *See* Nat'l Lab. Rel. Bd., General Counsel—Further Amendment to Memorandum Describing Authority and Assigned Responsibilities, 67 Fed. Reg. 62992, 62992 (Oct. 9, 2002) (citing other amending memoranda).

NLRB Office of the General Counsel, Electronic Redacted § 10(j) Manual §§ 5.2, 5.3, & 5.5 at 12 & 14 (2002).[6] The § 10(j) Manual does not describe the Board's procedure upon receipt of the General Counsel's memorandum, but the Board's Case Handling Manual suggests that the ordinary practice has been for the Board to vote on each petition individually:

> The Regional Office, based on either the Director's sua sponte determination or a request from the charging party, initially considers whether 10(j) relief is warranted. In contrast to 10(*l*) injunctive relief, where by statute interim relief must be sought whenever certain unfair labor practices have occurred and are likely to continue, the Board decides on a case-by-case basis whether to authorize the Regional Office to seek 10(j) relief.

NLRB Case Handling Manual, Part I, Unfair Labor Practice Proceedings § 10310 (2009).[7] After obtaining the Board's approval, the Regional Director files the § 10(j) petition in district court.[8] *See* 29 C.F.R. § 101.37 ("Whenever it is deemed advisable

---

[6]The redacted § 10(j) Manual is available at http://www.nlrb.gov/sites/default/files/documents/44/redacted_10j_manual_5.0_reduced.pdf (last visited June 8, 2011).

[7] The relevant section of the Case Handling Manual is available at http://www.nlrb.gov/sites/default/files/documents/44/chm_ulp_2011.pdf (last visited June 8, 2011). We later discuss the relevance of § 10(*l*).

[8] For whatever reason, § 10(j) petitions have historically been filed in the name of a regional director "for and on behalf of the Board." *See Gottfried v. Frankel*, 818 F.2d 485, 492 (6th Cir. 1987) (noting this practice). In accord with this longstanding practice, the plaintiff in this case is "Joseph F. Frankl, for and on behalf of the Board," not simply the "Board."

15

to seek temporary injunctive relief under section 10(j) . . . the officer or regional attorney to whom the matter has been referred will make application for appropriate temporary relief . . . .").

The Director and the Hotel dispute whether this procedure, case-by-case pre-filing approval by the Board of § 10(j) petitions, is mandated by the Act. We conclude that it is not.[9]

**B.**

The parties and some of the courts to have considered the question have assumed that if a Regional Director failed to obtain the necessary authorization to file a § 10(j) petition, that failure would deprive a district court of subject-matter jurisdiction. *See Osthus*, 2011 WL 1517949, at *2 (holding that the Board's delegation did not deprive the district court of "subject matter jurisdiction"); *El Paso Disposal*, 625 F.3d at 851-52 (same); *cf. Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 98-99 (1994) (dismissing a petition for certiorari for lack

---

[9] In *McDermott v. Ampersand Publishing*, 593 F.3d 950 (9th Cir. 2010), we considered an appeal from a denial of a § 10(j) petition approved by the General Counsel, but not by the Board. *See id.* at 956. We affirmed the district court on the merits without addressing the propriety of the procedure by which the agency arrived at the decision to file the petition. *See id.* at 956 n.4. Even if, as the Hotel maintains, a district court's jurisdiction turns on that procedure's propriety, *McDermott* is not of precedential significance as to that issue. *See Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) ("[W]e have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect.").

16

of jurisdiction because the FEC lacked "statutory authority to litigate th[e] case in" the Supreme Court without the Solicitor General's authorization).  In support of its contention that a district court's jurisdiction hangs in the balance, the Hotel observes that § 10(j)'s first sentence describes the manner and circumstances in which a § 10(j) petition may be filed, and its second sentence then provides that "[u]pon the filing of any *such* petition the court . . . shall have jurisdiction."  29 U.S.C. § 160(j) (emphasis added).  The use of the word "such," the Hotel argues, means that a district court does not have jurisdiction to grant § 10(j) relief if the petition seeking it was not approved in accordance with the terms of the first sentence.

An alternative view of the statutory language is that as long as the petition is facially regular—that is, is filed on behalf of the Board in the appropriate court, specifies that a complaint alleging an unfair labor practice has been issued, and requests appropriate relief—it is "such [a] petition" and the district court has jurisdiction to consider it.  On that view, issues concerning whether the petition was properly approved might at most be considered on the merits, but would not implicate the court's jurisdiction.  We regard it unlikely that Congress intended a district court's jurisdiction to depend on the backstage subtleties of how a facially proper petition came to be before it, especially as both the court and the respondent

17

in § 10(j) proceedings will often have no reason to suspect that a petition was not properly authorized.

Here, however, the issue of the propriety of the Board's 2007 delegation of its authority to approve § 10(j) petitions to the General Counsel has been squarely raised before us. Because we conclude that the General Counsel's exercise of that authority was permitted by the statute, it does not matter—except at one point in the analysis, *see infra* section II.D—whether the District Court's jurisdiction turned on the issue. We shall therefore assume, without deciding, that an improperly authorized § 10(j) petition would have implications for a district court's subject-matter jurisdiction.

## C.

### 1.

The Hotel urges us to read § 10(j)'s language as requiring that the Board approve each individual § 10(j) petition. That section provides, "*The Board* shall have power . . . to petition . . . for appropriate temporary relief . . . ." 29 U.S.C. § 160(j) (emphasis added). "The Board," the Hotel insists, means the five members of the Board, acting as a group, not the General Counsel and not the Regional

Director.[10]  By contrast, § 10(*l*), which was also added by the Taft-Hartley Act in 1947, provides that, upon the filing of certain kinds of charges with the Board, the charges must be investigated and

> [i]f, after such investigation, *the officer or regional attorney to whom the matter may be referred* has reasonable cause to believe such charge is true and that a complaint should issue, *he* shall, on *behalf of the Board*, petition [the appropriate] United States district court . . . for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter.

29 U.S.C. § 160(*l*) (emphases added).  In other words, § 10(*l*) makes clear that an officer of the Board—not the Board itself—not only may, but must, seek temporary injunctive relief to remedy certain narrow violations of the Act.  That § 10(j) references only the Board, not the Board's officers or regional attorneys, the argument goes, suggests that the Board itself must approve each § 10(j) petition before it is filed.

---

[10] In some contexts, there is a certain ambiguity as to what "the Board" is. "The Board" may refer to the entire agency responsible for the oversight of most private-sector labor relations in the United States (and so include the General Counsel and the regional directors), or it can refer only to the five-member council that governs that agency.  Section 10(j)'s reference to "the Board" refers to the five-member council.  *See* 29 U.S.C. § 152(10) (defining "the National Labor Relations Board" throughout the Act as "the National Labor Relations Board provided for in section 153"); *id.* § 153(a) ("the National Labor Relations Board (hereinafter called the 'Board') . . . is continued as an agency of the United States, except that the Board shall consist of five instead of three members . . . .").

We conclude that these statutory considerations are more than counterbalanced by a number of others.  As we explain, § 10(j) gives the Board the power to petition a court for relief, which the Board necessarily does through counsel, but does not specify the level of involvement that the Board must have with each individual petition.  The contrast with § 10(*l*) reflects only that § 10(*l*) removes from the Board the authority, left to the Board in § 10(j), to determine how and by whom the filing of petitions is to be authorized.  § 3(d) of the Act, providing that the General Counsel shall, in addition to the duties prescribed by the statute, "have such other duties as the Board may prescribe," supplies the Board's authorization to assign the General Counsel the duty to decide whether § 10(j) petitions should be filed.  Relying on these statutory features, we hold that, although the Board may reserve to itself the ultimate decision whether to petition for § 10(j) relief in individual cases, it may also exercise its power to petition for § 10(j) relief by authorizing the General Counsel to decide in which cases to seek relief on the Board's behalf.

2.

We begin with the observation that § 10(j) provides only that "[t]he Board shall have power . . . to petition" for relief.  29 U.S.C. § 160(j).  It does not specify

how the Board must exercise that power, or that the Board may not allow anyone else to decide when that power should be exercised in individual cases.

Section 10(j) is quite different in this respect from § 10(c), the provision of the Act discussing the Board's power to issue orders in unfair labor practice adjudications. *See* 29 U.S.C. § 160(c). That section provides that "[i]f upon the preponderance of the testimony taken *the Board* shall be of the *opinion*" that an unfair labor practice has occurred, "then the Board shall state *its* findings of fact and shall issue . . . an order requiring such person to cease and desist from such unfair labor practice." *Id.* (emphases added). This language contemplates that the Board shall form its own opinion and state its own findings of fact. There is no analogous suggestion in the language of § 10(j). Indeed, there is even a subtle difference between § 10(c)'s statement that the Board "shall issue . . . an order" and § 10(j)'s provision that the Board "shall have power . . . to petition" for relief. The former identifies the Board as the taker of the action in question (issuing orders), while the latter merely assigns the Board a power, without any clear implication as to how that power must be exercised or to whom it may be delegated.

Further, § 10(c) begins with a recognition that testimony may be "taken by [a Board] member, agent, or agency" of the Board, *see also* 29 U.S.C. § 160(b), before stating that after such a member, agent, or agency takes testimony, "in *its* discretion,

21

the *Board* upon notice may take further testimony or hear argument." *Id.* § 160(c) (emphases added). The section then goes on to describe, in the manner recounted above, the Board's duties to state its findings of fact, form its opinion, and issue orders in unfair labor practice cases. This distinction between the Board on the one hand and Board members, agents, and agencies on the other underscores that § 10(c)'s later references to the "Board's"—but not Board "members', agents' or agencies'"—duty to decide unfair labor practice cases and issue orders in them is further evidence that the Board may not authorize others to adjudicate individual unfair labor practice cases on its behalf. Again, there is no similar contrast in § 10(j), and so no basis for inferring a requirement that the Board itself make § 10(j) decisions on a case-by-case basis.

Another provision of the Act similarly supports through structural comparison the view that § 10(j) does not direct the Board to decide itself, on an individualized basis, whether to file petitions for interim relief with district courts. Unlike § 10(j), § 10(b) expressly contemplates the possibility of an "agent or agency designated by the Board for . . . purposes" of exercising the Board's "power" to issue complaints. 29 U.S.C. § 160(b).[11] But an examination of the statutory history of § 10(b) reveals

---

[11] Section 10(b), 29 U.S.C. § 160(b), provides:
Whenever it is charged that any person has engaged in or is engaging

(continued...)

that the inference to be drawn from that provision is that the use of the term "power"

to describe a particular Board activity does not preclude its assignment on a generic

basis to another official or officials.

Section 10(b), including its mention of an "agent or agency designated by the

Board" to exercise the Board's "power" to issue complaints, was included in the

---

[11](...continued)
in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of Title 28.

original Wagner Act, *see* 49 Stat. at 453-54, and left largely unamended by the Taft-Hartley Act. *See* 61 Stat. at 146-47. The Taft-Hartley Act, however, added § 3(d) to the NLRA, creating the position of General Counsel, designating the General Counsel as having "final authority, on behalf of the Board," to issue complaints, and providing generally for the assignment of "other duties" to the General Counsel. 61 Stat. at 139. The new § 3(d) thus both negated the Board's ability to make the specific delegation of Board "power" to issue unfair labor practice complaints contemplated by § 10(b) by assigning that "final" authority to the General Counsel, *and* obviated the need for any specific authorization within § 10(j) for discretionary delegations of the Board's powers, by providing generically in § 3(d) for such assignments to the General Counsel. So the mention of designated agents in § 10(b), far from defeating the notion that the Board's § 10(j) power may be exercised by an entity other the Board, in fact suggests that the Board's "powers" are not inherently nondelegable.[12]

_____

[12] The Hotel strenuously objects to the notion that § 3(d) has anything to do with the General Counsel's authority to approve § 10(j) petitions, an objection to which we later return. But, for now, the salient points are that § 10(j) is silent as to the level of generality at which the Board must exercise its power to petition, and that the Act has from the outset recognized that the Board can sometimes exercise its statutory "powers" by assigning them generically to other affiliated officials and allowing them to decide in which individual cases they should be exercised.

Finally, comparison between § 10(j) and § 10(*l*), does not detract from the conclusion that nothing in § 10(j) requires the Board to make case-by-case decisions as to § 10(j) petitions. For a subset of unfair labor practice cases, § 10(*l*) mandates, rather than allows, application for interim relief if "the officer or regional attorney to whom the matter may be referred has reasonable cause to believe [the] charge is true and that a complaint should issue." 29 U.S.C. § 160(*l*). The section also assigns the task of making the application for interim relief to "the officer or regional attorney to whom the matter may be referred . . . on behalf of the Board." *Id*. Section 10(*l*) thus establishes a mandatory procedure in respect to when to petition for interim relief and who should file the petition. By contrast, § 10(j) sets neither type of requirement, and so provides the Board with flexibility both as to whether to petition for mandatory relief and as to the decisionmaking process for determining whether to do so.

Section 10(j)'s silence speaks loudly enough that we might end the matter there, concluding that the Board may exercise its § 10(j) power by having the General Counsel decide whether to petition for § 10(j) relief in an individual case. Indeed, unlike stating findings of fact or issuing orders in unfair labor practice proceedings, it is hard to delineate the precise action that constitutes an exercise of the § 10(j) power. Surely, the multi-member Board is not required to make every

25

decision that arises in the course of litigating a § 10(j) petition. The multi-member council need not, for example, appear before the district court and recite its oral argument in unison. The Board's lawyers do—indeed, must—make such litigation decisions and so they are necessarily involved in the exercise of the Board's power to petition under § 10(j).

No more than it requires the Board's involvement in each decision relating to a § 10(j) petition does the language of the statute require that the Board approve each individual petition. In other words, nothing in the statute makes the individual petition the unit of analysis for determining when the Board is exercising its § 10(j) power. Moreover, petitioning a court for relief is a lawyerly function and the General Counsel is, after all, the supervisor of the Board's legal staff. *See* 29 U.S.C. § 153(d). So it seems quite natural that the Board could assign to the General Counsel the duty to decide when to exercise its power to petition. *Cf.* Am. Bar Ass'n, Model Rules of Prof'l Conduct, R. 1.2 cmt. 3 ("[T]he client may authorize the lawyer to take specific action on the client's behalf without further consultation . . . . [A] lawyer may rely on such an advance authorization.").

3.

More generally, we have previously observed that as far as delegation to subordinates is concerned, "[e]xpress statutory authority for delegation is not

26

required." *Loma Linda Univ. v. Schweiker*, 705 F.2d 1123, 1128 (9th Cir. 1983); *see U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent."); *see also Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 702 (9th Cir. 1996) ("Without express congressional authorization for a subdelegation, we must look to the purpose of the statute to set its parameters." (internal quotation marks omitted)).

It is true that the General Counsel's status as the Board's subordinate is not unequivocal. The General Counsel is an independently appointed and confirmed officer whose prosecutorial role Congress deemed it prudent to segregate from the Board's adjudicatory one. That fact complicates the application of the general presumption that delegations to subordinates are permissible in cases of statutory silence.

But the General Counsel is the Board's subordinate at least insofar as § 3(d) of the Act requires the General Counsel to perform "such other duties as the Board may prescribe." 29 U.S.C. § 153(d). The Act, in other words, is not silent. Upon careful consideration, we conclude that § 3(d) authorizes the Board to prescribe to the

General Counsel in particular the responsibility and authority to decide when to seek § 10(j) relief.

Section 3(d) of the Act provides that the General Counsel

> shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under [section 10], and in respect of the prosecution of such complaints before the Board, and *shall have such other duties as the Board may prescribe* or as may be provided by law.

29 U.S.C. § 153(d) (emphasis added). The Hotel contends that § 3(d) authorizes the delegation only of "duties," not of "powers," and so, because the Act describes the authority to petition for a § 10(j) injunction as a "power," 29 U.S.C. § 160(j), not as a "duty," § 3(d) cannot authorize the Board to delegate to the General Counsel generic authority to approve § 10(j) petitions.

A careful reading of § 3(d), informed by the Act as a whole, reveals that its use of the word "duties" does not contemplate that functions elsewhere described as "powers" may not be prescribed to the General Counsel. Section 3(d) provides that the General Counsel shall have "such *other* duties" as the Board may prescribe; it does not say simply say "such duties." 29 U.S.C. § 153(d) (emphasis added). For the use of the word "other" to be linguistically proper, § 3(d) must be read as having already listed some functions that may be construed as duties of the General Counsel. And, unsurprisingly, it has: The sentence in § 3(d) authorizing

28

the prescription of "other duties" begins by stating that the General Counsel "shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under [section 10], and in respect of the prosecution of such complaints before the Board."  29 U.S.C. § 153(d).  For the word "other" in the phrase "other duties" to make sense, § 3(d) must be read as presupposing that these enumerated functions of the General Counsel (i.e., the investigation of charges and the issuance and prosecution of complaints) are also "duties."

Other parts of the Act, however, refer to these same enumerated functions as "powers."  Section 10 of the Act, for instance, sets forth the Board's authority to issue complaints and is explicitly cross-referenced by § 3(d).  It provides that:

> the Board, or any agent or agency designated by the Board for such purposes, shall have *power* to issue and cause to be served upon such person a complaint . . . .

29 U.S.C. §  160(b) (emphasis added).  Similarly, Congress prefaced §§ 11 and 12 of the Act, which describe the Board's authority to investigate unfair labor practices, with the heading "Investigatory *Powers*."  Wagner Act, 49 Stat. at 455; Taft-Hartley Act, 61 Stat. at 150 (emphasis added); *see Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he heading of a section [is a] tool[] available for the resolution of a doubt about the meaning of a statute.") (internal

29

quotation marks omitted). So, read as a whole, the Act cannot be fairly said to contain any clear-cut distinction between "powers" and "duties."

That the Act appears to use the terms "power" and "duty" as largely interchangeable is unsurprising. One can only be under a duty to do that which one has the power to do, and a duty need not be an obligation to exercise a ministerial power. *Cf. Osthus*, 2011 WL 1517949, at *4-5 (Colloton, J., concurring) (observing that "it is not logically inconsistent for Congress to say that a superior body (the Board) may task a subordinate official (the General Counsel) with the 'duty' to exercise some of the Board's 'power'" and drawing an analogy to similar language in the Internal Revenue Code). The sum of the matter is that any inference from the text of the statute that the Act precludes the Board from assigning to the General Counsel the task of deciding in which individual cases § 10(j) petitions should be filed is, at best, exceedingly weak.

4.

One final consideration reinforces the conclusion that the Act permits the assignment of § 10(j) petition decisions to the General Counsel: Section 10(e) of the Act has long been interpreted and applied to permit the General Counsel, and not the Board itself, to make the ultimate decision whether to commence litigation in individual cases. Section 10(e)'s structure is nearly identical to that of § 10(j).

30

The agency's longstanding practice under § 10(e) is therefore persuasive evidence of the legality of its more short-lived and episodic practice under § 10(j). *See New Process Steel*, 130 S. Ct. at 2641-42.

Violation of an order issued by the Board at the conclusion of unfair labor practice proceedings does not result in any penalties for the violator. *See* 2 HIGGINS, *supra*, at 2802. "To secure compliance, the Board must apply to an appropriate U.S. court of appeals" for enforcement of its order. *Id.* Section 10(e) of the Act sets forth the power of the Board to petition for judicial enforcement of its orders, using language closely parallel to that of § 10(j). Specifically, § 10(e) provides, in part, that "[t]he Board shall *have power* to petition any court of appeals of the United States . . . for the enforcement of [its] order." 29 U.S.C. § 160(e) (emphasis added). Section 10(e) then includes a grant of jurisdiction that is structured in a manner essentially identical to § 10(j)'s, providing that "[u]pon the filing of such petition, the court shall cause notice thereof to be served . . . , and thereupon shall have jurisdiction of the proceeding and of the question determined therein." *Id*.

From 1950 to 2007, the General Counsel's litigation authority on behalf of the Board was, with rare exceptions, governed by memoranda containing the following language:

On behalf of the Board, the General Counsel of the Board will, in full accordance with the directions of the Board, petition for enforcement and resist petitions for review of Board Orders as provided in section 10(e) and (f) of the act, initiate and prosecute injunction proceedings as provided in section 10(j), seek temporary restraining orders as provided in section 10(e) and (f), and take appeals either by writ of error or on petition for certiorari to the Supreme Court: *Provided, however*, That the General Counsel will initiate and conduct injunction proceedings under section 10(j) or under section 10(e) and (f) of the act and contempt proceedings pertaining to the enforcement of or compliance with any order of the Board only upon approval of the Board, and will initiate and conduct appeals to the Supreme Court by writ of error or on petition for certiorari when authorized by the Board.

1955 Memorandum, 20 Fed. Reg. at 2175; 1950 Memorandum, 15 Fed. Reg. at 6924; *see* section II.A.2, *supra*. In other words, the memoranda assigned to the General Counsel *generic* authority to petition for enforcement of the Board's orders under § 10(e) of the Act. In the proviso, the Board required the General Counsel to obtain case-specific approval only to seek *injunctive relief* under § 10(j), (e) and (f) of the Act, to petition for Supreme Court review, and to bring contempt proceedings.[13]

---

[13] Because § 10(j) relief may expire upon the issuance of a final Board order, § 10(e) also provides that a court "shall have power to grant . . . temporary relief or [a] restraining order" pending the enforcement proceedings. 29 U.S.C. § 160(e). A request for such temporary relief is distinct from a petition to enforce an order of the Board.

Section 10(f) of the Act allows "person[s] aggrieved" by Board orders to petition for their review by a court and allows the court to grant temporary

(continued...)

The agency's longstanding practice of having the General Counsel, and not the Board, exercise final authority in approving petitions for enforcement under § 10(e) is strongly supportive of that practice's validity. *See New Process Steel*, 130 S. Ct. at 2641 (drawing on the "longstanding practice of the Board" as "persuasive evidence" that the Court's interpretation of the Act "is the correct one"); *Karsten v. Saint-Gobain Performance Plastics*, 131 S. Ct. 1325, 1335 (2011) (according deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to agencies' views in part because of "[t]he length of time the agencies have held them"); *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 566 n.20 (1979) ("[A]n administrative agency's consistent, longstanding interpretation of the statute under which it operates is entitled to considerable weight."). To conclude that the General Counsel could not exercise such authority would be to hold decades of unchallenged agency practice unlawful—a practice, moreover, in which courts have acquiesced thousands of times over by granting petitions for enforcement.

In *NLRB v. C&C Roofing Supply, Inc.*, 569 F.3d 1096 (9th Cir. 2009), for example, relying on the 1955 Memorandum, we observed that "[t]he General Counsel's authority to petition the courts of appeals for enforcement . . . is

---

[13](...continued)
injunctive relief similar to that available under § 10(e). 29 U.S.C. § 160(f).

permanently within the General Counsel's authority," explaining that such power "does not derive from the temporary delegation of 2007." *Id.* at 1098. Although we did not directly address the validity of the 1955 Memorandum's assignment of § 10(e) authority, the fact that we characterized the delegation as permanent evidences its longstanding nature and the history of judicial acquiescence in it.

Of course, if the statute clearly precluded the generic assignment of when to exercise the Board's § 10(e) power to the General Counsel, it would be our duty to tell the agency that it had been wrong all along. But the statute contains no such preclusion. Instead, it affirmatively suggests that the Board may exercise its power to petition for enforcement under § 10(e) by authorizing the General Counsel to decide when to petition for enforcement of Board orders in individual cases, for the same reasons, already discussed, that it may do the same under § 10(j). *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[T]he normal rule of statutory interpretation [is] that identical words used in different parts of the same statute are generally presumed to have the same meaning."); *Overstreet v. United Bhd. of Carpenters*, *Local Union No. 1506*, 409 F.3d 1199, 1206-07 (9th Cir. 2005) (same). The converse is, of course, also true. As long as the Board may grant generic authorization to the General Counsel to approve petitions for enforcement under § 10(e), the same must be the case under § 10(j).

In sum, we hold that the text of the Act, reinforced by the Board's longstanding practice under § 10(e), allows the Board to assign the General Counsel final authority in deciding when to petition for injunctive relief under § 10(j) in particular unfair labor practice cases pending before the Board.

The three other circuits that have addressed the question agree that district courts may entertain § 10(j) petitions approved by the General Counsel pursuant to the authority granted him by the Board in December 2007.  *See Osthus v. Whitesell Corp.*, No. 09-3209, —F.3d—, 2011 WL 1517949 (8th Cir. Apr. 22, 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 851-52 (5th Cir. 2010); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 539-40 (4th Cir. 2009).  Although our reasoning differs somewhat from that in those cases, our conclusion with regard to the validity of the Board's 2007 delegation of litigation authority under § 10(j) is identical.

## D.

Because we have assumed, without deciding, that the Regional Director's authority to petition for § 10(j) relief may have jurisdictional implications, we consider an issue that the Hotel did not raise, but that other circuits have considered and rejected—whether the reduction of the Board's membership to two, where it stood at the time the General Counsel approved the filing of the § 10(j)

35

petition here at issue, affected the ability of the General Counsel to file § 10(j) petitions. *See El Paso Disposal*, 625 F.3d at 853; *Osthus*, 2011 WL 1517949 at *2 (following *El Paso Disposal*); *see also Williams v. United Airlines, Inc.*, 500 F.3d 1019, 1021 (9th Cir. 2007) (noting our duty to raise questions of the district court's jurisdiction *nostra sponte*).

In a case decided before *New Process Steel*, the D.C. Circuit suggested that the reduction of the Board's membership to two would have such an effect. *See Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 473 (D.C. Cir. 2009). Considering the 2007 delegation of adjudicatory authority also at issue in *New Process Steel*, *Laurel Baye* drew on principles of agency and corporations law, broadly reasoning that "[i]n the context of a board-like entity, a delegee's authority . . . ceases the moment that vacancies or disqualifications on the board reduce the board's membership below a quorum." *Id.*

But *New Process Steel* rejected the D.C. Circuit's underlying premise in *Laurel Baye*: The Supreme Court emphasized that a quorum requirement only specifies the "number of members who must participate for [a multi-member organization] to take an action," not "a membership requirement that must be satisfied or else the power of any entity to which the Board has delegated authority is suspended." *New Process Steel*, 130 S. Ct. at 2642 n.4. In other words, *New*

36

*Process Steel* instructs that the Act's quorum requirement must be satisfied when the Board is acting directly through its members, but does not need to be satisfied for the Board's earlier exercises and assignments of its authority, made with a proper quorum, to remain valid and in effect.

Given that distinction, the Board-member quorum requirement in § 3(b) of the Act has only limited pertinence with regard to § 10(j). As we developed earlier, § 10(j) assigns the Board a "power" but does not mandate the case-by-case involvement of the Board as a multi-member organization in exercising that power. Thus, with respect to the Board's power to file petitions under § 10(j), it was sufficient that a quorum of the Board in 2007 decided to assign decisions as to individual petitions to the General Counsel. Under the distinction explained in *New Process Steel*, nothing in the Board's quorum requirement would cause the General Counsel's ability to file § 10(j) petitions to lapse after the Board's membership fell below a quorum.

## IV. THE MERITS OF THE INJUNCTION

We now consider the injunction on its merits.

Section 10(j) permits a district court to grant relief "it deems just and proper." 29 U.S.C. § 160(j). "To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,' district courts consider the traditional

equitable criteria used in deciding whether to grant a preliminary injunction."

*McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010). Thus, when a Regional Director seeks § 10(j) relief, he "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 129 S. Ct. 365, 374 (2008). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the [Regional Director] can support issuance of a preliminary injunction, so long as the [Regional Director] also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In all cases, however, the Regional Director "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Id.* at 1131 (emphasis omitted); *see Small v. Operative Plasterers' Int'l Ass'n, Local 200*, 611 F.3d 483, 491 (9th Cir. 2010) (observing that *Winter* abrogated *Miller*'s holding that a mere "possibility of irreparable harm" can be adequate); *McDermott*, 593 F.3d at 957 (same). "[T]he court must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial

power." *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 661 (9th Cir. 2001) (internal quotation marks omitted), *abrogated on other grounds as recognized by McDermott*, 593 F.3d at 957.

The District Court determined that the Director was likely to succeed on the merits and likely to suffer irreparable harm; that the balance of hardships tipped in the Director's favor; and that a preliminary injunction would be in the public interest. The District Court therefore enjoined the Hotel from various activities that, in its view, the Board would likely determine, and be affirmed by the Ninth Circuit in so determining, are unfair labor practices in violation of § 8(a)(1), (3) and (5) of the Act.

We may reverse the grant of a § 10(j) preliminary injunction "only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Miller*, 19 F.3d at 455. "Where the district court is alleged to have relied on erroneous legal premises, review is plenary." *Id.* (internal quotation marks omitted). Applying these standards, we affirm.

## A. Likelihood of Success on the Merits

### 1. *Legal Standards*

On a § 10(j) petition, likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that this Court would grant a petition enforcing that order, if such enforcement were sought.[14] *Cf. McDermott*, 593 F.3d at 964. We have explained that when the General Counsel, and not the Board, gives final approval to file a § 10(j) petition, "we do not presume that the Regional Director's position will ultimately be adopted by the Board." *McDermott*, 593 F.3d at 964; *see also Small*, 611 F.3d at 491 n.3 (expressing hesitation about whether according weight to the Regional Director's decision to file a § 10(*l*) petition is appropriate in evaluating the likelihood of success because such petitions are filed without the Board's approval); *United Bhd. of Carpenters*, 409 F.3d at 1207 n.12 (same). Because the Board did not approve the petition here, we do not accord significance to the fact of the petition's filing in evaluating the Director's likelihood of success.

Nonetheless, in evaluating the likelihood of success, "it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." *Miller*, 19

---

[14]Although the Board's June 14, 2011 decision, *HTH Corp.*, 356 N.L.R.B. No. 182 (2011), does not affect our analysis, its conclusions strongly support our own.

F.3d at 460. It is, after all, the Board and not the courts, which "has primary responsibility for declaring federal labor policy." *Id.* Additionally, and for similar reasons, "even on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel." *Id.* (internal quotation marks omitted). Given these considerations, it remains the case—whether or not the Board itself approved the filing of the § 10(j) petition—that the regional director in a § 10(j) proceeding "can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Id.*; *see also Scott*, 241 F.3d at 662 ("[T]o satisfy the 'likelihood of success' prong of the traditional equitable test, [the Director] need only show a better than a negligible chance of success." (internal quotation marks omitted)). But if the Director does not show that success is likely, and instead shows only that there are serious questions going to the merits, then he must show that the balance of hardships tilts sharply in his favor, as well as showing that there is irreparable harm and that the injunction is in the public interest. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

## 2. *Statutory provisions*

The District Court held that the Board would likely determine, and be affirmed by the Ninth Circuit in so determining, that the Hotel committed

41

violations of § 8(a)(1), (3) and (5) of the Act. Section 8(a)(3) makes it an unfair labor practice to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3); § 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees," *id*. § 158(a)(5); and § 8(a)(1) makes it an unfair labor practice to "to interfere with, restrain, or coerce employees in the exercise" of their rights to organize and to bargain collectively. *Id*. § 158(a)(1). "[A] violation by an employer of any of the four subdivisions of Section 8, other than subdivision one, is also a violation of subdivision one." 1 HIGGINS, *supra*, at 87 (internal quotation marks omitted).

### 3. *Underlying facts*

The Hotel is comprised of three business entities: the HTH Corporation, the Pacific Beach Corporation, and Koa Management, LLC. The three entities are owned by the Hayashi family and have officers and managers in common. All three entities are named respondents on the § 10(j) petition and are a single employer.[15]

---

[15] The Hotel has not challenged on appeal the District Court's determination that the Board will find that the three entities constitute a single employer for

(continued...)

42

From January 1, 2007 until December 1, 2007, a fourth entity, Pacific Beach Hotel Management, LLC ("PBHM"), a subsidiary of an otherwise unrelated hotel chain, the Outrigger Group, managed the Hotel. Neither the Outrigger Group nor PBHM is a respondent in this case or in the proceedings before the Board.

Initially, Robert Minicola and David Mori played the lead roles in collective bargaining. Minicola, the Regional Vice President of Operations of the HTH Corporation and the Pacific Beach Corporation had decision-making authority as to all labor-related issues for the Hotel and represented the Hotel in the negotiations. David Mori served as the chief spokesperson for the Union.

As previously noted, the Union was certified on August 15, 2005. Between November 29, 2005 and December 14, 2006, the Union and the Hotel engaged in thiry-seven bargaining sessions. Throughout these sessions, the Hotel insisted on three contractual provisions that the Union charged were so objectionable as to evidence the Hotel's refusal to bargain in good faith.

First, the Hotel insisted on a union recognition clause providing:

> The employer has and shall maintain at any and all times its sole and exclusive right to unilaterally and arbitrarily change, amend, and modify the certified bargaining unit . . . and any and all hours, wages, and/or other terms and conditions of employment at-will [sic].

---

[15](...continued)
purposes of the Act.

43

The Hotel also proposed a management rights clause specifying that all terms and conditions of employment, including the right "to select, hire, discipline and discharge employees at will," "shall remain vested exclusively in the Hotel." The third objected-to provision set forth the Hotel's proposed grievance procedure: The Hotel insisted that all employee or Union complaints be adjudicated by the relevant department manager, with appeals to the director of human resources and ultimately to the general manager of the Hotel.

As the ALJ remarked,

> these three proposals [were] all of a piece. The first is a demand for [cession] of any control whatsoever over the bargaining unit itself. The second sets parameters which allow the Union virtually no say in the nature of the jobs held by employees which the Union represents. The third, [while] facially allowing for some sort of appeal procedure in the event of an on-the-job grievance, actually sets up only an illusion . . . [as] it all end[s] up in the hands of the general manager . . . .

In large part because of the Hotel's insistence on these three provisions, the parties had not reached an agreement on an initial contract by January 1, 2007. On that date, PBHM assumed management of the facility and workforce.

PBHM, a newly formed subsidiary of the Outrigger Group, had entered into a management agreement with the Pacific Beach Corporation on September 6, 2006, well after collective bargaining with the Union had begun. The management

agreement required PBHM to hire all current Hotel employees at the same jobs, with the same rates of pay and benefits and the same seniority dates. PBHM was also to be responsible for bargaining with the Union. Under the terms of the management agreement, however, the approval of the Hotel's owner was required before PBHM could agree to any contract "if the cost to the Hotel under that [contract] exceeds . . . $350,000," or if the contract exceeded one year in duration and could not be terminated upon thirty days' notice. Because, as PBHM's lead negotiator testified, a collective bargaining agreement lasting less than a year or terminable upon thirty days' notice would be of limited value and also because any plausible agreement lasting longer than a year would cost more than $350,000, the management agreement effectively gave the Hotel veto power with regard to PBHM's negotiations with the Union. The management agreement also required that its terms be kept confidential, so PBHM could not inform the Union of the Hotel's broad reservation of the right to reject contracts.

The Union and PBHM reached tentative accord on most items and, by the end of June, 2007, were on the verge of reaching an overall agreement. PBHM requested Hotel approval to propose a contract which it believed the Union would accept. PBHM also requested that the Hotel permit it to disclose to the Union the Hotel's reservation of the right to reject contracts. When the Hotel did not consent

45

to the contract or to disclosure, PBHM informed the Hotel that if the Hotel continued to refuse to grant its two requests for consent, PBHM would believe itself unable to fulfill its obligation to bargain in good faith under the Act, and the Hotel would be in violation of its covenant to "reasonably consent to . . . requests" under its management agreement with PBHM. Four days later, the Hotel exercised its right to terminate the management agreement with PBHM.

Effective December 1, 2007, Pacific Beach Corporation resumed its management of the facility. The Hotel required all employees to reapply for their jobs, and then reinstated most, but not all, employees. The District Court found that, out of union animus, the Hotel did not continue the employment of five bargaining committee members. Also effective December 1, 2007, the Hotel withdrew recognition from the Union, based on Minicola's observations that attendance at Union rallies had declined and unspecified "verbal and written indications that the majority of employees did not want to be represented by the Union." From then on, the Hotel refused to bargain with the Union. The Hotel also unilaterally granted wage increases to certain employees and changed employees' work schedules and responsibilities. In July, 2008, the Hotel determined that it had received signatures from a majority of bargaining unit

employees on a petition stating that the employees did not desire Union representation and thereupon purported to withdraw recognition a second time.

#### 4. *Likelihood of success: § 8(a)(5)*

The Board will find that an employer has violated its duty to bargain under § 8(a)(5) of the Act if the employer has failed to bargain in good faith with a union, *see Regency Serv. Carts, Inc.*, 345 N.L.R.B. 671, 671 (2005), or if it has engaged in a per se violation of its duty to bargain, regardless of its good faith. *See, e.g.*, *NLRB v. Katz*, 369 U.S. 736, 743 (1962).

To determine a party's good faith, the Board looks to the "totality of the [r]espondent's conduct, both at and away from the bargaining table." *Hardesty Co.*, 336 N.L.R.B. 258, 259 (2001) (internal quotation marks omitted), *enf'd* 308 F.3d 859 (8th Cir. 2002). An employer is not required to "make concessions or yield any position fairly maintained," *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972), but is "obliged to make *some* reasonable effort in *some* direction to compose his differences with the union." *Regency Serv. Carts, Inc.*, 345 N.L.R.B. at 671 (internal quotation marks omitted) (emphasis in original). Thus, "mere pretense at negotiations with a completely closed mind and without a spirit of cooperation does not satisfy the requirements" of § 8(a)(5). *Id.* (internal quotation marks omitted).

Here, the ALJ determined that the Hotel violated § 8(a)(5) by (1) engaging in bad faith bargaining in 2006; (2) engaging in bad-faith bargaining through PBHM in 2007; and (3) committing per se violations by refusing to bargain and unilaterally changing terms and conditions of employment after it withdrew recognition from the Union in December 2007. The Regional Director argues, and the District Court concurred, that the Board is likely to agree with the ALJ's § 8(a)(5) conclusions and likely to be upheld in that respect upon judicial review. We agree.

**(i)** "[T]he Board has held that a proposal that vested exclusive control in the employer on the setting of wages, while offering little more than the status quo in return, was significant evidence of an intent to frustrate agreement, and in conjunction with other indicia of bad faith, violated of Section 8(a)(5) of the Act." *In re Liquor Indus. Bargaining Grp.*, 333 N.L.R.B. 1219, 1220 (2001), *enf'd* 50 F. App'x 444 (D.C. Cir. 2002). More generally, while "the mere insistence upon a management-rights clause is not a *per se* violation of the Act, the Board has consistently held that a violation is made out when, as here, the employer demands a contractual provision which would exclude the labor organization from any effective means of participation in important decisions affecting the terms and conditions of employment of its members." *United Contractors Inc.*, 244 N.L.R.B.

48

72, 73 (1979) (footnote omitted), *enf'd* 631 F.2d 735 (7th Cir. 1980). Taken together, the Hotel's proposed recognition clause, management rights provision, and one-sided grievance procedure would exclude the Union from any meaningful representational role. As a result, the Board is likely to find that the Hotel's insistence on these three clauses is exceedingly persuasive evidence of the Hotel's lack of good faith in bargaining during 2006.

In addition, the Regional Director points to, and the ALJ and the District Court both found, other evidence of bad-faith bargaining. *See A-1 King Size Sandwiches, Inc.*, 265 N.L.R.B. 850, 858 (1982) (adopting the ALJ's conclusion that an employer bargained in bad faith "primarily" based on the employer's "bargaining proposals and positions," especially "viewed in the light of statements indicative of [the employer's] attitude toward collective bargaining"). That evidence included Minicola's repeated reminders that the Union had won by a one-vote margin, notwithstanding the fact that the Board found that the Hotel had engaged in objectionable conduct preceding the election that quite possibly affected the margin of victory. Moreover, the Hotel's objectionable conduct preceding both elections, as well as its subsequent violations of § 8(a)(3) and (5), discussed below, constitute further evidence from which the Board may infer that the Hotel had no intent to resolve its differences with the Union in 2006. In light

of this evidence and the Hotel's bargaining position, the Director has established a sufficient likelihood that the Board will reasonably determine that the Hotel bargained in bad faith in 2006.

**(ii)** The Hotel also challenges the District Court's finding that the Board is likely to determine that the Hotel bargained in bad faith from January 1, 2007 to December 1, 2007, the period during which PBHM was responsible for bargaining with the Union. The Court held the record adequate to support the conclusion that PBHM acted as an agent for the Hotel in collective bargaining and that the Hotel's cancellation of the management agreement with PBHM, when a collective bargaining agreement was imminent, while continuing to keep its veto authority over a prospective agreement secret, constituted bad-faith bargaining. The Regional Director asks us to affirm that holding.[16]

---

[16] One initial point bears consideration with regard to this time period: It would seem not to matter whether the Hotel engaged in bad-faith bargaining while the PBHM management agreement was in effect, if it did so both before and afterward, as we would affirm the interim bargaining order no matter whether the Hotel bargained in bad faith during the PBHM management agreement period. The District Court, however, ordered the Hotel to "resume contract negotiations and honor all tentative agreements entered into from the point [the Hotel] and the Union, and PBHM and the Union, left off negotiations on November 30, 2007." Thus, whether it was "just and proper," 29 U.S.C. § 160(j), to require the Hotel to resume bargaining from the tentative agreements reached by PBHM could turn on whether the Hotel was a statutory employer when PBHM reached those agreements. For that reason, we reach the latter issue.

50

The District Court's reasoning as to this point was comprehensive and persuasive. Rather than repeat and summarize it, we append that portion of the District Court's opinion, with some clarifying redactions. *See infra* Appendix A.

The Hotel's three objections to that reasoning are unavailing. It is true that the ALJ did not hold that PBHM was the Hotel's agent, but he did nonetheless hold that the Hotel was the statutory employer during the period of the management agreement. The District Court was under no obligation to adopt the ALJ's reasoning wholesale to issue § 10(j) relief. The District Court instead needed only to determine whether the Board was likely to determine that the Hotel was the statutory employer, and to be affirmed by this Court in so determining.

The Hotel challenges the District Court's agency determination on its merits only by arguing that that determination stands in tension with PBHM's statement that the HTH Corporation was no longer the employer and that the District Court based its agency finding "simply" on the Hotel's power to cancel the management agreement. Neither of these objections bears weight. PBHM's statements about who the employer was do not prevent the Board from answering that legal question itself. And the District Court based its agency determination on the fact that the Hotel reserved the right, in secret, to veto any likely collective bargaining agreement, not simply on its power to cancel the management agreement.

51

**(iii)** Finally, as the District Court determined, the Regional Director has a strong likelihood of establishing that the Hotel violated § 8(a)(5) after December 1, 2007, the date as of which the management agreement with PBHM ended. It is undisputed that the employer from that date on was the Hotel. The Hotel did not resume bargaining at that point. Instead, it withdrew recognition from the Union.

An employer may only withdraw recognition from a union based on "objective evidence" of a loss of majority support, *see Levitz Furniture Co. of the Pac., Inc.*, 333 N.L.R.B. 717, 723-25 (2001), and, even then, withdraws recognition "at its peril," *id.* at 725. "If the union contests the withdrawal of recognition in an unfair labor practice proceeding, the employer will have to prove by a preponderance of the evidence that the union had, in fact, lost majority support at the time the employer withdrew recognition. If it fails to do so, it will not have rebutted the presumption of majority status, and the withdrawal of recognition will violate Section 8(a)(5)." *Id.* (footnote omitted). The Hotel has not presented any objective evidence of a loss of majority support as of December 1, 2007.

In any case, "employers may not withdraw recognition in a context of serious unremedied unfair labor practices tending to cause employees to become disaffected from the union." *Id.* at 717 n.1. The Board is likely to find that the

52

Hotel's bad-faith bargaining in 2006 and 2007, as well the § 8(a)(3) violations discussed below, constituted pervasive unfair labor practices sufficient to taint any evidence showing that the Union had lost the support of employees. Consequently, the Hotel could not have validly withdrawn recognition in December 2007, even if it had had objective evidence of the Union's loss of majority support.

The Hotel argues that it will be able to rebut the presumption that the unfair labor practices caused the loss of majority support. But it is unlikely to be able to do so. The Hotel did not resume bargaining with the Union after the unfair labor practices in 2006 and 2007. *See Lee Lumber & Bldg. Material Corp.*, 322 N.L.R.B. 175, 178 (1996) ("In the absence of unusual circumstances, . . . [the] presumption of unlawful taint can be rebutted only by an employer's showing that employee disaffection arose after the employer resumed its recognition of the union and bargained for a reasonable period of time without committing any additional unfair labor practices that would detrimentally affect the bargaining."). The Board is therefore likely to determine, and to be affirmed by this Court in so determining, that the Hotel committed a violation of § 8(a)(5) when it withdrew recognition on December 1, 2007.

The July 2008 petition submitted by the Hotel and purporting to show a loss of majority support for the Union is, as the District Court found, irrelevant, both

because of the effect of the prolonged unfair labor practices on employee support for the Union and because the Hotel withdrew recognition on December 1, 2007, without any objective evidence of the loss of union support, and refused to bargain with the Union thereafter. Whether the Hotel purported to withdraw recognition a second time, and whether it had a basis for doing so, simply does not matter.

Additionally, if the Board finds that the withdrawal of recognition was improper, it will likely also find that the Hotel committed a per se violation of § 8(a)(5) by unilaterally changing the terms and conditions of bargaining unit employees' employment after unlawfully withdrawing recognition from the Union. *See Local Joint Exec. Bd. v. NLRB*, 540 F.3d 1072, 1075 (9th Cir. 2008).

## 5. *Likelihood of success: § 8(a)(3)*

The District Court determined that the Director was likely to succeed in showing that the Hotel violated § 8(a)(3) by terminating five Union leaders, all long-term Hotel employees and all members of the Union's negotiation team, when it reclaimed management responsibilities from PBHM. The Hotel limits its challenge to this determination to arguing that the District Court applied the wrong legal standard, maintaining the Hotel did not terminate but only refused to *rehire* the employees on December 1, 2007. The theory is that PBHM was a distinct employer from the Hotel, so that the latter was hiring afresh as of December 2007.

54

The District Court found that the Hotel decided not to continue the employment of the five long-term employees because of their leadership roles in the Union. The Hotel does not now argue that this finding was clearly erroneous. Refusing to hire new employees because of their prior union involvement is as much an unfair labor practice as is firing current employees for that reason. *See FES (A Division of Thermo Power)*, 331 N.L.R.B. 9, 12 (2000), *enf'd* 301 F.3d 83 (3d Cir. 2002); *id.* at 12-13 (applying the discriminatory discharge framework from *Wright Line*, 251 N.L.R.B. 1083 (1980), to refusal-to-hire violations). While the General Counsel must in the hiring context prove "that there was at least one available opening for the applicant," *id.* at 12, the Hotel does not contest that there were such openings here. As to union animus, the burden is on the Regional Director to demonstrate its role in motivating the employment decision with regard to either a termination or a failure to hire, and both the ALJ and District Court found that the Regional Director had met that burden for each of the five excluded employees.[17]

## B. Likelihood of Irreparable Harm

_____

[17] As the above discussion of PBHM's status as an agent suggests, we do not mean to indicate that the Hotel did not remain the statutory employer throughout. If it did remain the employer, then the District Court was correct to apply the test for terminations, not refusals to hire. Our point in the text is only that this consideration does not matter for purposes of the § 8(a)(3) analysis.

*Small* rejected, as inconsistent with *Winter*, *Miller*'s holding that a court may presume irreparable harm in § 10(j) and § 10(*l*) cases if a likelihood of success on the merits in the unfair labor practice proceeding is established. 611 F.3d at 490, 494. At the same time, *Small* retained from *Miller*, as consistent with *Winter*, the underlying irreparable injury standard applicable in cases such as this one: In the context of the NLRA, "permit[ting an] alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm." *Id.* at 494 (quoting *Miller*, 19 F.3d at 460) (alteration in original). In other words, while a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief. In making the latter determination, inferences from the nature of the particular unfair labor practice at issue remain available.

For instance, with regard to the central statutory violations likely established here, violations of § 8(a)(5), continuation of that unfair labor practice, failure to bargain in good faith, has long been understood as likely causing an irreparable injury to union representation. The Board long ago observed that:

> Employees join unions in order to secure collective bargaining. Whether or not the employer bargains with a union chosen by his employees is normally decisive of its ability to secure and retain its members. Consequently, the result of an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether.

*Karp Metal Prods. Co.*, 51 N.L.R.B. 621, 624 (1943) (footnote omitted). As the Seventh Circuit has likewise noted, "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996). Consequently, even if the Board subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties. That difficulty will increase as time goes on. And the Board generally does not order retroactive relief, such as back pay or damages, to rank-and-file employees for the loss of economic benefits that might have been obtained had the employer bargained in good faith. *See* 2 HIGGINS, *supra*, at 2775. Thus, a finding of likelihood of success as to a § 8(a)(5) bad-faith bargaining violation in particular, along with permissible inferences regarding the likely effects of that violation, can demonstrate the likelihood of irreparable injury, absent some unusual circumstance

indicating that union support is not being affected or that bargaining could resume without detriment as easily later as now.

In a similar vein, "the discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001) (internal quotation marks omitted); *see id.* (observing that other employees' "fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)"). For these reasons, a likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances.

We have already determined that the District Court did not abuse its discretion or make any errors of law in finding that the Director had established a likelihood of success with regard to the bad-faith bargaining and the exclusion of union leaders from the workforce violations. The same evidence and legal conclusions, along with permissible inferences regarding the likely interim and long-run impact of the unfair labor practices likely to be found, preclude the conclusion that the District Court abused its discretion in finding a likelihood of irreparable harm.

The Hotel's primary argument as to why the Director cannot show irreparable harm is the contention that the Director's delay in filing the § 10(j) petition is fatal to his claim that interim relief is necessary to prevent irreparable harm. The first unfair labor practice charge was filed on January 22, 2007; the Director issued an administrative complaint on August 29, 2008, covering many incidents, including the withdrawal of recognition and the exclusion of the five union leaders from the workplace, that occurred long after the initial charge was filed. The Director filed the § 10(j) petition on January 7, 2010, after the ALJ decision upholding the Director's various unfair labor practice allegations. By awaiting the ALJ decision, the Director made the District Court's task in evaluating the propriety of interim relief much easier, and much more likely to be carried out accurately, as the Court had the benefit of a record developed over thirteen days of hearings and also of the ALJ's legal analysis and conclusions.

For its excessive delay contention, the Hotel relies on *McDermott*, in which this Court held that a district court did not abuse its discretion in ruling that, given a thirteen- to seventeen-month delay between the alleged occurrence of unfair labor practices and the filing of a § 10(j) petition, "an interim order . . . [was unlikely to] provide any genuine reassurance to employees beyond that provided by a final Board order." *McDermott*, 593 F.3d at 965 (internal quotation marks omitted). At

59

the same time, *McDermott* recognized that "delay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Id.* (internal quotation marks omitted). Rather, "[t]he factor of delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *Id.* (internal quotation marks omitted).

*McDermott*'s observation regarding the effect of delay in that case is inapposite for several reasons. First, with respect to its conclusion that the delay in seeking relief properly supported the finding of a lack of irreparable harm, because of the First Amendment interests the employer in that case invoked, *McDermott* was applying a special, heightened standard. *See McDermott*, 593 F.3d at 958 (adopting and applying *United Bhd. of Carpenters*'s conclusion that "in light of the risk that protected First Amendment speech would be restrained . . . 'only a particularly strong showing of likely success, *and of harm . . . as well*, could suffice'" (quoting *United Bhd. of Carpenters*, 409 F.3d at 1208 n.13) (second ellipsis in original) (emphasis added)); *id.* at 964 ("*In light of the First Amendment issues in this case*, we conclude that the district court did not abuse its discretion by declining to grant preliminary relief. The standard for such relief is a tough one, taking into account [*United Bhd. of Carpenters*'s] increased demands." (emphasis

added)). As the District Court in this case noted, no First Amendment interests are here at stake, and viewed under ordinary irreparable injury standards, "[a]s more time passes, it becomes less likely that these discharged employees will return to the Hotel," undermining the unionization effort. *Norelli v. HTH Corp.,* 699 F. Supp. 2d 1176, 1203-04 (D. Haw. 2010).

Second, in this case, the record provided specific support for the conclusions that there would likely be irreparable harm beyond that which could be remedied once the Board had ruled, and that interim relief was more likely to curb the ongoing unfair labor practices than subsequent relief. For one thing, the former employees whose interim reinstatement the Regional Director sought were members of the bargaining committee. Having current employees on the bargaining committee in daily contact with the other employees and therefore able to judge the impact of various bargaining proposals on their constituencies is likely to affect not only the other employees' willingness to adhere to union support, but also the interim bargaining process itself. For that reason, the § 8(a)(3) relief in this case is intimately tied up with the interim bargaining order.

Moreover, here, the passage of time did not entirely preclude the District Court's ability to restore the status quo. The Union was willing to represent the employees and to bargain on their behalf under an interim bargaining order.

Recognizing and bargaining in good faith during the period the Board is considering the exceptions to the ALJ's ruling both would directly restore to the employees the advantages of day-to-day union representation during that period, advantages that cannot be restored retroactively, and also could lead to the conclusion of a collective bargaining agreement, with concomitant employee benefits, during the interim period. Thus, the interim relief ordered immediately remedied statutory injuries as to which no retroactive relief is available.

Finally, of course, there is the fact that *McDermott* was reviewing denial of interim relief under an abuse-of-discretion standard, while we are reviewing the *grant* of relief under that same standard.

For each of these independent reasons, we conclude that the District Court was not required to deny relief because the Regional Director awaited the ALJ's decision before filing the § 10(j) petition.

### C. Balance of the Hardships

The District Court determined that the balance of the hardships weighed in the Director's favor. The primary hardship the Hotel had advanced was the protection of its employees from the Union, which, the Hotel claims, the employees did not want to represent them. The Hotel renews that hardship argument before us. We also reject it.

"[I]n considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the alleged[] unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority." *Miller*, 19 F.3d at 460. For that reason, the District Court's determination that the Regional Director had shown likely irreparable harm to the collective bargaining process meant that there was also considerable weight on his side of the balance of the hardships.

The Hotel's asserted countervailing interest, its employees' alleged desire not to be represented by the Union, fails to outweigh the hardships advanced by the Regional Director. As an initial matter, there is "nothing unreasonable in giving a short leash to the employer as vindicator of its employees' organizational freedom." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 790 (1996). For that reason, courts generally are skeptical about an employer's claimed "benevolence as its workers' champion against their certified union." *Id.*; *see also Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 50 n.16 (1987).

More importantly, by establishing a strong likelihood of success on the merits of the alleged § 8(a)(3) and (5) violations, the Regional Director showed that it was more likely than not that the Hotel had committed pervasive unfair labor practices. As the Board's case law indicates, in the context of pervasive unremedied unfair

labor practices, it becomes impossible to know if employees truly no longer want representation by the elected union, as their expressed preferences are generally tainted by the effects of the unfair labor practices. *See Lee Lumber*, 322 N.L.R.B. at 177-78. In all likelihood, it will only be possible accurately to gauge union support after the Hotel ceases and desists from its allegedly unfair labor practices and resumes bargaining with the Union—precisely the relief the Regional Director sought and the District Court granted. The District Court, therefore, had no reason to give significant weight to the Hotel's assertions concerning support for the Union, and so properly assessed the balance of the hardships.

### D. Public Interest

"In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Miller*, 19 F.3d at 460. Ordinarily then, when, as here, the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest.

The Hotel contests that conclusion as applied here, objecting that the Director "was literally asking the District Court to grant the Board's remedy, before the Board itself even has a chance to decide the case." But, in most bad-faith bargaining cases, a § 10(j) remedy *will* be identical, or at least very similar, to the

Board's final order.  This precept follows from the nature of interim § 10(j) relief

and of the Board's final remedial power.

The purpose of § 10(j) relief is "to preserve the Board's remedial power."

*Miller*, 19 F.3d at 459-60.  The task of the Board in devising a final remedy is "to

take measures designed to recreate the conditions and relationships that would have

been had there been no unfair labor practice."  *Franks v. Bowman Transp. Co.*, 424

U.S. 747, 769 (1976) (internal quotation marks omitted).  Very often, the most

effective way to protect the Board's ability to recreate such relationships and restore

the status quo will be for the court itself to order a return to the status quo.  *See*

*Scott*, 241 F.3d at 660 (observing that "injunctive relief under section 10(j) is

intended to preserve the status quo pending final action by the Board").  So the

District Court cannot have abused its discretion just because it entered an order

similar to the one the Board will likely enter in this case.[18]  We have thus no reason

---

[18] We also decline the Hotel's invitation to follow *Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 144 (3d Cir. 1975), which imposed a six-month temporal limitation on all § 10(j) relief (subject, in certain circumstances, to extension).  No other court of appeals has followed *Eisenberg* in imposing such a rule. C*f. Pye v. Teamsters Local Union No. 122*, 61 F.3d 1013, 1025 (1st Cir. 1995) ("abjur[ing] the Third Circuit's rule" and leaving the decision to impose a temporal limitation on § 10(j) relief within "the sound discretion of the district court").  We have never adopted a per se rule imposing a fixed temporal limitation on all § 10(j) relief.  Under no requirement to impose such a limitation, the District Court did not abuse its discretion in declining to do so in this case.

to disturb the District Court's determination that injunctive relief was in the public interest.

## CONCLUSION

For the foregoing reasons, the District Court's injunction is AFFIRMED.


## APPENDIX A

*Appended Excerpt of* Norelli v. HTH Corp*., 699 F. Supp. 2d 1176 (D. Haw. 2010)*


c. *Whether Respondents engaged in bad faith bargaining from January 2007 through November 2007*

In September 2006, Koa and PBHM signed the [Management Agreement (the "MA")] for PBHM to take over "the marketing, operation, direction, Hillsborough maintenance, management, and supervision of all portions of the Hotel," effective January 2007. Both Respondents and PBHM told the Union that in light of the MA, PBHM and not Respondents was the employer of the Hotel employees. Despite these assertions, the ALJ found that "although Respondents contractually delegated PBHM to run the Hotel and to bargain collectively with the Union on Respondents' behalf [during this time], at no time were Respondents relieved of the obligation to

66

bargain in good faith with the Union" and that Respondents engaged in bad faith bargaining during this time period.

The ALJ came to this conclusion by finding that Respondents were the "true employer" of the Hotel staff during this time. Petitioner has filed a limited cross-appeal requesting that the Board make an explicit finding of agency. As explained below, the court does not reach whether the Board will determine that Respondents were the "true employer," but rather concludes that the Board will find and the Ninth Circuit will affirm that PBHM was an agent of Respondents for purposes of negotiating a [collective bargaining agreement ("CBA")], and that Respondents never intended to permit PBHM to enter into a CBA with the Union.

i. *Respondents' and PBHM's principal/agent relationship as to CBA negotiations*

An "employer" for purposes of the NLRA "includes any person acting as an agent of an employer, directly or indirectly." 29 U.S.C. § 152(2). The NLRA further provides that "[i]n determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13).

The Board applies common law agency principles to determine the existence of an agency relationship. *See, e.g.*, *Tyson Fresh Meats, Inc.*, 343 N.L.R.B. 1335,

67

1336 (2004). An agency relationship may therefore exist between a purported agent and principal where the agent possesses either actual or apparent authority to act on the principal's behalf: "actual authority refers to the power of an agent to act on his principal's behalf when that power is created by the principal's manifestation to him. That manifestation may be either express or implied." *Id.* (quoting *Commc'n Workers Local 9431 (Pacific Bell)*, 304 N.L.R.B. 446 n.4 (1991)).

Petitioner has presented evidence from which the Board will likely conclude and the Ninth Circuit will affirm that PBHM was simply acting as Respondents' agent for purposes of negotiating the CBA. Respondents, through the MA, gave PBHM express authority to negotiate a CBA with the Union. Despite the MA's assertion that PBHM "is an independent contractor, and nothing in this Agreement or in the relationship of [Respondents and PBHM] shall constitute a partnership, joint venture, agency, or other similar relationship," Respondents retained ultimate control over the negotiations. Specifically, the MA required PBHM to obtain Respondents' approval prior to entering into any CBA:

> Operator shall obtain Owner's approval of any agreement
> affecting the Hotel (i) the term of which is more than one
> (1) year in length and that cannot be terminated upon
> thirty (30) days' notice by Operator, or (ii) if the cost to
> the Hotel under that agreement exceeds Three Hundred
> Fifty Thousand Dollars ($350,000.00), or (iii) that

extends beyond the Initial Term and cannot be terminated upon thirty (30) days' notice by Operator.

Section 3.2.c of the MA effectively gave Respondents veto power of any proposed CBA between PBHM and the Union-given the long term negotiations with the Union, PBHM was not interested in a CBA for less than one year because it "would hardly give [PBHM] . . . a[ ] stable period to develop relationships with the employees and [ ] to operate the business." Additionally, a one-year collective bargaining agreement would cost the Hotel more than $350,000, requiring Respondents' approval.

Indeed, despite Minicola's and PBHM's outward statements to the Union that HTH was no longer operating the Hotel, PBHM worked under the assumption that Koa—as the Hotel's "owner"—must approve any CBA between PBHM and the Union. For example, both Wilinsky and Rand sent letters to Respondents, seeking Koa's approval on proposals to the Union, which PBHM believed would result in a CBA. Wilinsky explained to [the Hotel's owner] that "[PBHM] cannot bargain in good faith with the Union until and unless [it] receive[s] [Koa's] consent."[3]

---

[3] The court's conclusion is confirmed by Respondents' decision to cancel the MA only four days after PBHM sought their approval of contract terms that would have resulted in a CBA. As explained below, it appears that Respondents canceled the MA to prevent the Union from learning of its role in negotiations.

69

In opposition, Respondents suggest that the MA was a "typical management agreement" under which PBHM operated as the owner and employer at the Hotel. The court rejects this argument. While Respondents may have hoped to create the appearance that PBHM was . . . the . . . employer, the MA was not "typical" but rather allowed Respondents to retain control over the Union negotiations, creating the principal-agent relationship described above.

In sum, the record supports that while Respondents certainly attempted to distance themselves from the Union negotiations by using PBHM as the "official" operator of the Hotel, PBHM's control was illusory because Respondents held the ultimate authority over Union negotiations. Accordingly, the Board will likely find and the Ninth Circuit will affirm that the MA did not vest to PBHM Respondents' employer status but instead merely made PBHM Respondents' agent.

The court recognizes that the ALJ did not make an agency determination and instead found that Respondents were the "true" employers of the Hotel employees. The ALJ's "true employer" language does not change the court's analysis. Petitioner alleged in its Conformed Complaint that PBHM served as Respondents' agent within the meaning of 29 U.S.C. § 152(13) for the purposes of engaging in collective bargaining with the Union and operating the Hotel. Further, implicit in the ALJ Decision's finding that Respondents were the true employers is that PBHM

70

was acting on Respondents' behalf during this time period.  Given that Petitioner seeks a limited cross-appeal seeking an agency determination, the court finds that on the record presented, the Board will likely make and the Ninth Circuit will affirm this determination.

ii. *Respondents' bad faith bargaining during this time period*

On August 3, 2007—four days after PBHM sought its approval of contract terms which would have resulted in a CBA—Respondents canceled the MA with PBHM. Based upon the record presented, Petitioner asserts that Respondents never had any intention of allowing PBHM to enter into a CBA with the Union and canceled the MA to prevent Respondents from having to reject the proposed CBA and/or disclose its veto power over the CBA to the Union.  The court agrees that the Board will find and the Ninth Circuit will affirm that Respondents engaged in bad faith bargaining over this time period by having PBHM negotiate with the Union while at the same time knowing that it would never approve any CBA.

The evidence establishes that Minicola clearly did not want a CBA with the Union, much less any Union presence at the Hotel. During initial negotiations, Minicola told PBHM that [the Hotel's owner] was upset with the employees for voting for the Union, and that Respondents would move to decertify the Union at the end of the certification year in 2006.  Rather than move to decertify the Union,

71

Respondents entered into the MA with PBHM, who was well aware that Minicola was "very unhappy" with the concept of a CBA.

The terms of the MA required that it be kept confidential, and the Union was not aware of its language giving Respondents veto power over a CBA. PBHM nonetheless negotiated with the Union and by June 29, 2007, the parties were close to entering into an agreement with only "a few issues outstanding." Respondents were aware that a CBA was imminent—PBHM told Respondents of this progress and even requested direction given its understanding that Respondents did not want a finalized CBA. By letter dated July 30, 2007, PBHM asked Koa, as "owner" under the MA, to consent to PBHM providing the MA's contract approval provision to the Union (along with other provisions as well), and that Koa approve 11 specific proposals for the CBA. PBHM explained that if it made these 11 proposals, the Union would accept them and the parties would likely enter into a CBA. PBHM further asserted that if Respondents refused to consent, Respondents would be in breach of the MA and that PBHM would no longer be able to bargain in good faith with the Union. PBHM received no response from Respondents. Instead, on August 3, 2007, Respondents terminated the MA, effective December 30, 2007.

At the time Respondents canceled the MA, they were faced with some hard decisions regarding PBHM and the Union. They could reject PBHM's proposals

72

and allow PBHM to disclose the MA's contract approval provision to the Union, but then the Union would know of Respondents' involvement and authority on Union negotiations. Alternatively, Respondents could have approved the proposals, but then the Union would be on the verge of a CBA—the very result Respondents had been trying to avoid since negotiations began in 2006. The third alternative—to cancel the MA and purport to take over the Hotel operations as a new employer—avoided both of these results. Given the facts presented, it appears that Respondents canceled the MA simply to derail the final stages of the Union negotiations and prevent the Union from learning of its role in negotiations over this time period. Accordingly, the Board will likely find and the Ninth Circuit will affirm that Respondents engaged in bad faith bargaining during this time period.

In opposition, Respondents provide no explanation why they terminated the MA except for a vague reference to "performance issues," which, from the record, may refer to PBHM's delay in installing Stellex, PBHM's failure to keep occupancy rates up, PBHM's changes to projected performance figures, disputes over fees and commissions, and the fish deaths in the aquarium. The record does not support that these excuses are valid reasons for terminating the MA.

As to the delay in installing Stellex, Outrigger's proprietary property management and reservation system, it was eventually installed and properly

operating within the Hotel by May 2007. Further, Minicola had worked at Outrigger for 15 years and was familiar with the Stellex system, such that he should have anticipated that installing Stellex takes significant effort.

As to PBHM's projected occupancy rate and performance figures, Respondents asserted before the ALJ that PBHM did not perform up to par with its projections, yet Minicola testified that the decline in the Hotel's occupancy was in part due to the decline in the tourism economy. Moreover, Wallace explained during the time PBHM was managing the Hotel, profits "were in excess of [PBHM's] projections and considerably in excess of the prior year's operations."

As for PBHM's changes to projected performance figures, the MA required PBHM to submit a formal budget to Respondents within 90 days of the start of its management of the Hotel. PBHM submitted a preliminary budget in a timely fashion, and Respondents approved PBHM's request to extend the time allotted to PBHM to prepare a formal budget, allowing PBHM enough time to acquire knowledge of how the property operates. Once PBHM finished its formal budget, PBHM revised its projected performance figures to take into account the formal budget. These changes were therefore in line with basic budgeting principles and not a basis for termination.

Regarding the fees and commissions, Respondents and PBHM had disagreements regarding the 1.5% chain service fee PBHM proposed to charge Respondents for providing services to the Hotel and the 2.5% commission Respondents wanted to charge PBHM on all Japanese wholesale business. The parties resolved these disputes, however, with Respondents accepting the 1.5% charged to the Hotel after PBHM explained the basis for this charge, and PBHM continuing to pay the 2.5% commission to Respondents.

Finally, as for the dead fish in the aquarium, it is unclear whether Respondents truly assert this problem as a reason for terminating the MA because Minicola did not identify it as a reason in his affidavit before the ALJ. In any event, PBHM apparently addressed this issue by meeting with the chief engineer to stabilize the oxygen in the tank and replacing the dead fish.

In sum, Respondents' alleged reasons for terminating the MA are unsupported. The Board will likely find and the Ninth Circuit will affirm that Respondents engaged in bad faith bargaining by allowing PBHM to negotiate with the Union while at the same time knowing that they would never approve a CBA, and then canceling the MA simply to derail the negotiations between the Union and PBHM and hide their position as Hotel employer.

## COUNSEL

*For Petitioner-Appellee Joseph F. Frankl, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board*: Judith Ilene Katz, Margaret E. Luke (argued), and Steven Lewis Sokolow, National Labor Relations Board, Washington, D.C.; Jill H. Coffman and Olivia Garcia, National Labor Relations Board Region 20, San Francisco, Calif.; Thomas W. Cestare, Trent Kiyoshi Kakuda, and Dale Kanayo Yashiki, National Labor Relations Board Sub-Region 37, Honolulu, Hawaii.

*For Respondents-Appellants HTH Corporation, Pacific Beach Corporation, and Koa Management, LLC*: Wesley Fujimoto (argued) and Ryan Sanada, Imanaka Kudo & Fujimoto LLC, Honolulu, Hawaii.