**Cornele A. OVERSTREET, Petitioner,**

v.

**ONE CALL LOCATORS LIMITED, Respondent.**

**No. CV–14–01649–PHX–ROS.**

United States District Court, D. Arizona.

Signed Sept. 8, 2014.

Fernando Jose Anzaldua, Marissa Erin Thielen, Paul R. Irving, National Labor Relations Board, Phoenix, AZ, for Petitioner.

Alastair James Gamble, Frederick Charles Miner, Littler Mendelson PC, Phoenix, AZ, Richard P. Doyle, Jr., Jaime Bianca Herren, Doyle Low LLP, Orinda, CA, for Respondent.

## ORDER

ROSLYN O. SILVER, Senior District Judge.

Before the Court is Petitioner's Petition for Temporary Injunction Under § 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(j). For the following reasons, the Petition will be granted in part.

## BACKGROUND

Except as explicitly noted, the following is the Court's view of the evidence. Respondent is a Montana corporation with facilities in Phoenix that contracts with utility companies to locate the contracting company's underground utility lines. Individuals or businesses in Arizona that intend to dig into the ground on their property must first have the underground utility lines identified and marked. Some of Respondent's' employees serve as "local technicians" or "locators" who identify and mark on the ground any underground utility lines belonging to the utility companies. Respondent has a workforce of approximately 80–90 locators in Phoenix.

In January 2014, some of Respondent's Phoenix employees attempted to organize to gain union representation with the International Brotherhood of Electrical Workers Local 387, AFL–CIO (the "Union").[1] On or about January 5, 2014, Daniel Polley, an employee of Respondent, reached out to Robert Sample, a representative of the Union. Polley signed an authorization card[2] and invited Sample to speak with other employees about the Union. On January 27, Mike Perez, a supervisor for Respondent, held a tailgate meeting at a Kmart parking lot on 1–17 and Northern.[3] About 20 to 30 employees attended. When Perez finished speaking, Sample approached the employees about their right to organize. Sample also approached Perez to introduce himself, and

---

1. In 2012 and 2013 Respondent's employees also attempted to organize to gain union representation, but Respondent terminated five employees who were at the forefront of the organizing campaign. Unfair labor practice charges were filed against Respondent. However, the parties ultimately entered into a settlement stipulation, in which Respondent paid $1000 and back pay to the terminated employees in place of reinstatement. The settlement stipulation also required Respondent to post notices to employees stating it would refrain from certain actions such as retaliating against joining the union. However, the settlement agreement did not contain an admission of unfair labor practices on the part of Respondent.

2. An authorization card states the employee signing the card authorizes the Union to represent him/her as his/her bargaining representative with the employer.

3. A tailgate meeting is where supervisors meet with their teams of employees on the morning before the employees disperse to complete their assignments. The meetings generally happen in shopping centers or public parking lots.

according to Sample, Perez "pretty much said, it is ok, I know what you are here to do." According to Polley, Perez did not leave until all the employees were gone. Respondent subsequently announced that all tailgate meetings would occur at Respondent facilities. Sample and Polley spent the next several weeks handing out Union literature and collecting authorization cards from employees.

## A. Discharge of Garrett Forrest

In early January 2014, Garrett Forrest, also an employee of Respondent, attended a tailgate meeting and learned of planned cuts to his employee benefits. The employees were informed via text message their vacation time would be reduced from six paid holidays to three paid holidays, and their health care benefits would be entirely cut. Forrest took a picture of the screen on his phone with the text message and told other employees to do so as well. Later that day, Forrest called manager Jorden Serfass and asked for an explanation regarding the cut in benefits. According to Forrest, he told Serfass and his supervisor Milton Austin he thought the cuts were "bullshit." On January 16, 2014, Forrest was injured while working and took workers' compensation leave. On January 28, 2014, Sample came to Forrest's home, where Forrest signed an authorization card and returned it to Sample. Forrest was not on the Union's organizing committee and Sample was not aware of any supervisors or managers who observed Forrest talking to co-workers about his desire for union representation

On that same day, Respondent flagged two transactions in which Forrest's personal identification number ("PIN") appeared to have been used to purchase diesel fuel on Saturday January 25, 2014 in Glendale, Arizona, and Sunday January 26, 2014 in Sun City, Arizona.[4] None of Respondent's vehicles operate on diesel fuel. Respondent has a strict policy, of which Forrest was aware, that misuse of a gas card will result in discipline up to and including termination. The extent of Respondent's investigation of the stolen gas was confirmation that it was diesel fuel that was stolen and that it was Forrest's pin number that was used. Forrest returned to work on January 31, 2014 and was terminated that day. When Respondent terminated Forrest, Respondent informed Forrest that if he wished to challenge his termination he must contact his supervisor the following day. Forrest did not contact Human Resources or anyone in management to challenge the findings regarding his termination.

## B. Discharge of Daniel Polley

On March 3, 2014, Respondent asked Polley to meet with Serfass in the field after Southwest Gas reported a damaged gas line. Polley told Serfass that he had experienced difficulty when attempting to locate the gas line and had called Austin to help him. Though Serfass never spoke with Austin about the issue, Serfass claims he checked Respondent's records and did not see any record of a "trouble locate" in relation to this site. The damage to the line was recorded on Polley's record, although there was no actual gas leaking from the line. Prior to this incident, Polley had been responsible for gas damage in September 2013 and December 2013, in which the gas lines were punctured and gas spilled into the air. However Polley

---

**4.** As part of Forrest's employment, Respondent provided Forrest with a vehicle. Each vehicle has a Fleet Gas Card, kept inside the vehicle and used to pay for gas. Each Fleet Gas Card is coded to the vehicle's ID number and requires the employee to enter his PIN, which is the last six digits of his social security number.

was not disciplined for these two prior incidents and Polley believed they had not been included on his record.

The following day, Perez told Polley his Southwest Gas card had been revoked and he could not do assignments involving gas lines. Later that day, Perez suspended Polley for three days. On March 6, 2014, Polley met with Robert Eggli, Perez, and Serfass. Eggli explained to Polley that he had been suspended due to his previous "record of damages." Eggli referred to Polley's previous "write-ups" that his supervisor Austin had signed, but Polley had refused to sign. Polley claims he was never presented with such write-ups and that Austin denies ever having signed such documents.[5] Normally, it is Respondent's policy to have two managers sign off on a discipline form when an employee refuses to sign. On March 11, 2014, Polley again met with Perez, Eggli, and Serfass. Eggli informed Polley that because his gas card had been revoked, he could not be recertified, and his employment had been terminated. Polley was never placed on a probation period or made eligible for rehire. At least two other employees had their gas cards revoked, but were not fired. Since Polley's termination, Union organizing activities slowed.

## C. The Union Election

On February 25, 2014, the Union filed a petition for representation election. At the time it petitioned for the election, the Union had collected 55 authentication cards out of the approximately 90 employees working out of Phoenix. Respondent alleges it was unaware of any Union organizing activity until it received this petition for representation election. In late February, Respondent also hired two labor consultants to speak with the employees. These consultants solicited grievances from employees. In March 2014, Respondent reinstated the paid holiday leave, which had been cut in January 2014. Respondent also provided improved equipment to employees.

Originally, the parties agreed those eligible to participate in the election included only employees from Phoenix. However, Respondent proposed they open the election to locators in surrounding locations such as Prescott, Flagstaff, and Globe. This would increase the potential voting population to about 100. The Union agreed and held the election on March 28, 2014. The agreement to open the election to other areas did not include Tucson. The Union lost the election by a vote of 43 to 47. Two employees from Yuma were denied the right to vote in the election.

## D. Petitioner's Request for Relief

On April 2, 2014, the Union filed an unfair labor practice charge with NLRB, alleging unlawful termination of two employees during the organizing drive, in violation of § 8(a)(3) of the NLRA. On April 4, 2014, the Union also filed objections to Respondent's conduct affecting the election, alleging violations of § 8(a)(1) of the NLRA. On April 8, 2014, the Union filed an additional charge with the NLRB, seeking a remedial *Gissel* bargaining order, which would require Respondent to recognize the Union as the collective bargaining agent of the employees, despite having lost the election, alleging violations of §§ 8(a)(1), 8(a)(3), and 8(a)(5). On May 30, 2014, the NLRB issued an order consolidating the first two charges and setting an administrative hearing before an ALJ on September 9, 2014. The parties have allotted three weeks for litigation before the ALJ. On July 11, 2014, the third charge was consolidated into the case, and on July

---

5. Austin no longer works for Respondent.

14, 2014, an amendment to the complaint was issued by the Regional Director. On July 22, 2014, Petitioner moved for a temporary injunction in the district court, pursuant to § 10(j) of the NLRA.

## ANALYSIS

### I. Legal Standard for a § 10(j) Injunction

Pursuant to § 10(j) of the NLRA, a regional director of the NLRB may petition a district court for injunctive relief against a party against whom an NLRB unfair-labor-practice administrative action is also pending. *See* 29 U.S.C. § 160(j); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1341 (9th Cir.2011). "The purpose of a § 10(j) injunction is 'to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes' an unfair labor practice complaint." *Frankl*, 650 F.3d at 1341 (quoting *Miller v. Cal. Pac. Med. Center*, 19 F.3d 449, 459–60 (9th Cir.1994) (en banc)). While some deference is accorded to the NLRB on factual issues, the final determination of whether to issue an injunction rests within the discretion of the district court. *See Miller*, 19 F.3d at 458 ("Even though § 10(j) is an exception to the primary jurisdiction of the NLRB over labor disputes, it reflects an intention that the district court will exercise judgment rather than simply sign off on Board requests … when Congress wanted to tell the courts to give the benefit of the doubt to the Board's expertise, it knew how to do so.").

■ Under § 10(j), a district court my grant relief "it deems just and proper." 29 U.S.C. § 160(j). "To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,' district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *Frankl*, 650 F.3d at 1341 (quoting *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir.2010)). Thus, a regional director seeking § 10(j) relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). These elements are evaluated on a "sliding scale" in which the required showing of likelihood of success decreases as the showing of irreparable harm increases. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–34 (9th Cir.2011). In all cases, however, the regional director "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Frankl*, 650 F.3d at 1341.

As with all preliminary injunctions, a § 10(j) determination does not result in an "adjudication on the merits but rather [is] a device for preserving the status quo and preventing the irreparable loss of rights before [a] judgment" that will be issued by the NLRB after an unfair labor practices hearing. *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir.1984). Accordingly, evidence which would be inadmissible at trial may be considered. *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc) ("It was within the discretion of the district court to accept [ ] hearsay for purposes of deciding whether to issue the preliminary injunction."). *See also Overstreet ex rel. Nat'l Labor Relations Bd. v. W. Prof'l Hockey League, Inc.*, CV–09–0591–PHX–ROS, 2009 WL 2905554, at *2 (D.Ariz. Sept. 4, 2009).

### II. Petitioner Has Met His Burden for a § 10(j) Injunction

■ Petitioner has met his burden of establishing he is likely to succeed on the

merits, he is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in his favor, and an injunction is in the public interest.

## A. Likelihood of Success on the Merits

Petitioner alleges unfair labor practices that involve violations of §§ 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA. Doc. 1 at 2. According to the Ninth Circuit, "the regional director in a § 10(j) proceeding 'can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory.'" *Frankl*, 650 F.3d at 1356 (quoting *Miller*, 19 F.3d at 460). Petitioner has met his burden.

### 1. Section 8(a)(1)

Section 8(a)(1) prohibits employers from "interfere[ing] with, restrain[ing], or coerc[ing] employees in the exercise of their rights guaranteed in [§ 7 of the NLRA]." 29 U.S.C. § 158. Section 7 rights include the right to organize, to form, join, or assist a labor organization, and engage in activity for the purpose of collective bargaining. 29 U.S.C. § 157. The test of interference, restraint, and coercion under § 8(a)(1) of the NLRB is not high. Indeed, the test "does not turn on the employer's motive. The test is whether the employer engaged in conduct, which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act." *In re Am. Tissue Corp.*, 336 NLRB 435, 441–42 (2001). *Cf. Holly Farms Corp.*, 311 NLRB 273, 274 (1993) ("[W]e draw an inference of improper motivation and interference with employee free choice from all the evidence presented and from the Respondents' fail-

ure to establish a legitimate reason for the timing of the increase."). However, "benefits granted in the critical period which are pursuant to a past practice or a decision reached prior to the filing of a petition" do not violate § 8(a)(1). *Stanley Smith Sec.*, 270 NLRB 225 (1984). Likewise, "an increase in benefits that results from a corporate-wide decision and is implemented corporate-wide in a normal business fashion" is also permissible under § 8(a)(1). *Id.*

Petitioner has alleged a wide variety of § 8(a)(1) violations. Having reviewed the record, Petitioner has shown, at the very least, "some evidence" that Respondent engaged in unfair labor practices in violation of § 8(a)(1). First, it appears Respondent became aware of Union activity as of the end of January 2014, and not in March 2014 as Respondent alleges. Polley and Sample testified that Mike Perez became aware of Union activity as of January 27, 2014, when Sample attended the tailgate meeting held by Perez. Respondent's witness, Josh Hinrichs, also stated Respondent moved the tailgate meetings to inside Respondent's facility so that Respondent "could have, you know, more privacy, you know, more discussions with [its] employees." In addition, Polley testified he heard Perez discuss the tailgate meeting location change, and Perez stated that Respondent moved the meetings so that the Union guys could not come around. As such, it appears Respondent was aware of Union activity by the end of January 2014.

Second, Petitioner provided "some evidence" that as of February 2014, Respondent hired consultants to solicit grievances, reinstated paid holidays, and provided improved equipment to its employees.[6] Juan

---

**6.** Respondent argues Petitioner no longer asserts Respondent improperly Provided holiday benefits or wage increases in response to

union organizing. Doc. 57 at 18. However, it appears Petitioner has not abandoned this

Guerrero testified that Respondent hired labor consultants in February 2014, who held a mandatory meeting for employees, where the consultants solicited grievances from the attendees. Those at the meeting stated they wished to have their holidays reinstated and complained they needed newer safety equipment. · Respondent granted both requests. Multiple members of Respondent's management team including Mr. Serfass and Mr. Graves confirmed they hired such consultants, and Respondent failed to provide any evidence that hiring labor consultants to solicit grievances was part of a past practice. *Cf. Stanley Smith Sec.*, 270 NLRB 225 (1984).

Respondent contends the reinstatement of paid holidays was a nationwide decision, and the email from Mr. Hartman dated February 10, 2014 demonstrates it intended to provide new equipment as of October 2013, long before it became aware of any Union activity. *See* Doc. 22 at 32. However, there is nothing in the email giving any indication that Mr. Hartman had been in the process of requesting new equipment since October. Indeed the email states in its entirety, "In need of some equipment in AZ, [sic] if any of you have some of these items sitting around on this list please get with me [sic] so that we can get this stuff moved." Doc. 22-5 at 39. And while Plaintiff has not rebutted Respondent's argument that the reinstatement of paid holidays was a nationwide decision, the proximity in time between Respondent's becoming aware of Union activity, soliciting grievances from employees, and granting both requests is sufficient to show "some evidence" that Respondent "engaged in conduct, which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act." *In re Am. Tissue Corp.*, 336 NLRB 435, 441–42 (2001). *See also Center Service System Division*, 345 NLRB 729, 730 (2005), enforced in relevant part, 482 F.3d 425 (6th Cir.2007) (solicitation of grievances influences employee choice during an organizational campaign because it raises inferences that the employer is promising to remedy those grievances).

## 2. Section 8(a)(3)

Section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." To establish a violation of § 8(a)(3), Petitioner must show the "employee's protected conduct was a substantial or motivating factor in the adverse employment action." *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Indeed, "in all cases alleging violation of Section 8(a)(3)" the NLRB requires that the petitioner "make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision. Once this is established, the burden ... shift[s] to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Wright Line, A Div. of Wright Line, Inc.*, 251 NLRB 1083, 1089 (1980). In other words, to establish a § 8(a)(3) violation, Petitioner "must show union or other protected activity, employer knowledge of that activity, animus or hostility toward that activity, and a causally related adverse personnel action." *Ronin Shipbuilding, Inc. & Union De Trabajadores Industriales De Puerto Rico*, 330 NLRB 464, 465–66 (2000). "An employer cannot simply present a legitimate reason for its actions

claim as it asserts it in response to Respondent's trial brief. *See* Doc. 56 at 8.

but must persuade by a preponderance of the evidence that the same action would have taken place even in the absence of the protected conduct." *Peter Vitalie Co.,* 310 NLRB 865, 871 (1993). The Court may rely on circumstantial as well as direct evidence in determining an employer's motivation. *Lippincott Indus., Inc. v. N.L.R.B.,* 661 F.2d 112, 116 (9th Cir.1981).

Petitioner argues it has met its burden in demonstrating that the termination of Forrest and Polley violate § 8(a)(3). Doc. 50 at 4. Defendant argues neither termination violates the NLRA, as both were done for legitimate business purposes. Doc. 57 at 3, 5. The Court agrees with Petitioner that he has met his burden to demonstrate Polley's termination violated the NLRA, but finds he has not met his burden with regards to Forrest's termination.

### a. Polley's Discharge

Petitioner has met his burden in demonstrating Polley's Union activity was a substantial motivating factor in his termination. That Polley engaged in protected activity, and Respondent had knowledge of this activity is undisputed. It is also undisputed that Polley suffered an adverse employment action when he was discharged on March 11, 2014. The close proximity in time between the Union's request for an election and Polley's termination is sufficient to show a causal link between Polley's termination and Respondent's anti-union animus. *Ronin Shipbuilding,* 330 NLRB at 466.

Respondent's main argument is that Polley's discharge was out of its hands, and based solely on Southwest Gas's decision to revoke Polley's card indefinitely due to the damage he caused. *See* Doc. 567 at 5. Indeed, Serfass emphatically stated that the decision was solely that of Southwest Gas. However, immediately after Serfass' testimony, Mr. Martin from Southwest Gas

made clear that Southwest Gas's decision to revoke any gas card is based on a "joint investigation" with Respondent, and that his decision to revoke Polley's gas card in particular was not based on Southwest Gas's independent investigation. Rather, this decision was a result of a combination of investigations by Southwest Gas and Respondent. Martin further explained that in determining any disciplinary action, he and one of Respondent's managers discuss the damage and whether the employee was at fault. Further, Eggli testified that it is Respondent's policy to have two managers sign-off on a discipline form when an employee refuses to sign it. Yet the discipline forms that mysteriously appeared in Polley's personnel file contain only the signature of one manager who no longer works for the company. And it appears Respondent never turned over the original discipline forms, despite repeated requests from Petitioner.

Moreover, Respondent has failed to show it would have taken the same action absent Polley's Union activity. Aside from the contested discipline forms, Respondent has provided no evidence that it had any problems with Polley's performance prior to Polley's union activity. And though Polley had been responsible for much worse damages before, he had never been formally disciplined. Indeed Eggli and Martin both testified that Polley had previous damages with gas spewing into the air, but encountered no consequences. In contrast, Petitioner provided the personnel file of Ian Stillwell (Stillwell), a locator who worked for Respondent in 2013. Stillwell failed Southwest Gas audits on three different occasions, and on each occasion, his Southwest Gas card was pulled. It was only on the third failure that Respondent discharged Stillwell. *See* PX 46. As such, Respondent has failed to rebut Petitioner's allegations, and Petitioner has met his bur-

den in establishing Polley's termination was motivated by Polley's union activity

### b. Forrest's Discharge

Petitioner has not met his burden of showing that Forrest's discharge was motivated by his union activity, as Petitioner cannot show Respondent was aware of Forrest's union activity. As an initial matter, January 9 was the only tailgate meeting that occurred before Forrest went on worker's compensation leave on January 16 and Polley testified there was no union activity at that tailgate meeting. Polley further stated he first contacted Sample on January 6 about the possibility of union organizing, and Forrest did not attend the January 27 meeting in which Sample handed out cards and spoke with Perez. Aside from signing the authorization card, Petitioner has presented no evidence of Forrest's union activity. And Petitioner has failed to explain how Respondent would have known Forrest signed his authorization card from his home while on leave from work. The fact that Forrest told Serfass the revocation of benefits was "bullshit" on January 9 is insufficient to establish Respondent's knowledge of Forrest's union activity. Therefore, Petitioner has failed to provide even "some evidence" that Forrest's discharge was motivated by Respondent's anti-union animus.

### 3. Section 8(a)(5) and the Need for a *Gissel* Order

Section 8(a)(5) prohibits employees from refusing "to bargain collectively with the representatives of its employees, subject to the provision of section 159(a) of this title." [7] 29 U.S.C. § 158. Petitioner argues pursuant to *NLRB v. Gissel Packing Co.,*

*Inc.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), Respondent is obligated to recognize and bargain with the Union based on the signed authorization cards reflecting majority support for the Union. Doc. 50 at 7. In *N.L.R.B. v. Gissel Packing Co,* the Supreme Court held that the NLRB may order an employer to recognize and bargain with a union even when employees have not chosen union representation through the normal election procedure. 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). These bargaining orders are appropriate in two circumstances. First, when an employer has engaged in such "outrageous" and "pervasive" unfair labor practices "that a fair and reliable election can't be held," the NLRB may order bargaining even absent a showing of majority support for the Union. 395 U.S. at 613–14, 89 S.Ct. 1918. Second, the NLRB may order bargaining when the Union shows that it once had a majority and that its support was "undermined" by unfair practices that "impede[d] the election process." *Id.* at 614, 89 S.Ct. 1918.

Following *Gissel,* district courts in the Ninth Circuit have granted "interim bargaining orders" on grounds that the purpose of the § 10(j) injunction is to protect the integrity of the collective bargaining process. *See, e.g., Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates,* 241 F.3d 652, 661 (9th Cir.2001) ("To permit illegal employer conduct to go unaddressed while the Board's corrective machinery grinds toward resolution would subvert the underlying purposes of § 10(j) and allow those who commit unfair labor practices to reap the benefits of that conduct. Interim bargaining orders are therefore sometimes

---

**7.** Under § 159(a), "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment ..." 19 U.S.C. § 159(a).

necessary to preserve the status quo pending litigation before the Board.") (citing S.Rep. No. 105). However, the standard applied in a request for § 10(j) relief is less than that applied by the Board. The district court in a § 10(j) proceeding need not make an independent determination as to whether a bargaining order is appropriate. Rather,

> in order for [Petitioner] to satisfy the likelihood of success test ... he need only present a fair chance of succeeding on the merits. The existence of at least one 'hallmark' violation of the NLRA ... is sufficient to satisfy this minimal test and allow a consideration of the balance of hardships resulting from an interim bargaining order.

*Id.* at 666; *Overstreet ex rel. N.L.R.B. v. Gunderson Rail Servs., LLC,* 5 F.Supp.3d 1073, 1096–98 (D.Ariz.2014). Further, when issuing a *Gissel* order, the Court must determine which employees are to be included in the bargaining "unit" represented by the Union. An appropriate unit "contains employees who are readily identifiable and share a community of interest among themselves." *In re Specialty Healthcare & Rehab. Ctr. of Mobile,* 357 NLRB No. 83 (Aug. 26, 2011).

Petitioner has met his burden to show likelihood of success of receiving a bargaining order for the unit defined as "all full-time and regular part-time locate technicians and splice technicians who work out of the Employer's Phoenix, Arizona facility." *See* DX 109. Sample testified that the employees in this unit are those found in Exhibit 48, and that he had received a majority of authorization cards from employees in this unit, which were admitted into evidence as PX 49. He also testified that in handing authorization cards to employees, he informed those employees that their signatures meant that they wanted the Union to be their exclu-

sive collective-bargaining representative. Respondent did not dispute the definition of this unit or present any evidence disputing the individuals listed as part of the unit, either at the hearing or in its prior pleadings. However, in its closing brief Respondent argues for the first time the unit should be defined according to a list Respondent created for the election. However, this list appears to include individuals who work out of the Tucson office, which was never agreed to by Petitioner. *See* Doc. 56 at 2 n. 2. The unit defined above was agreed to by both parties, *see* DX 109, and "contains employees who are readily identifiable and share a community of interest among themselves." *In Re Specialty Healthcare & Rehab. Ctr. of Mobile,* 357 NLRB No. 83 (Aug. 26, 2011).

Respondent also argues for the first time in its closing brief that the Union did not have a majority of authorization cards, as five of the cards are stale because their signature dates are from 2012 or 2013. *See* Doc. 52 at 13. Cards dated within a "reasonable time" of the filing of a petition are considered to be current, where "a 1–year period is considered to be a reasonable time." *Sunbeam Corp.,* 287 NLRB 996, 1033 (1988). Here, all but four cards are dated less than a year before the filing of the representation petition in the underlying matter. Sample's affidavit states that he spoke to each of the four card-signers at issue and verified that they still wanted the Union as their exclusive bargaining representative and that their cards should be kept active. PX 23, 73–74; *See Lowery Trucking Co.,* 177 NLRB 13, 20 (1969), *enfd.* 431 F.2d 280 (8th Cir.1970) (card over one year old and signed during previous organizing campaign considered valid because it was reaffirmed orally by the employee at a recent event). Respondent chose not to take the opportunity to cross examine Sample on this issue. Respondent's claim that Sample had not col-

lected a majority of authorization cards is therefore unconvincing.

Petitioner also presented evidence that despite having received a majority of authorization cards, the Union's support was "undermined" by unfair practices that "impede[d] the election process." *Gissel,* 395 U.S. at 614, 89 S.Ct. 1918. Petitioner provided testimony that Polley was discharged two weeks before the Union election, and that following his discharge, employees became fearful. Indeed, Polley, Sample, and Guerrero all testified that multiple employees contacted each of them to find out why Polley was fired, if it was due to the Union, and questioned whether they should continue to support the Union. As discussed above, Petitioner also provided evidence that Respondent interfered with the election campaign by soliciting grievances, reinstating holiday pay, and providing improved equipment. Petitioner has therefore met his burden to show that the election was likely impacted by Respondent's discharges of Polley and other unfair labor practices, and that the NLRB will likely issue a *Gissel* order.

## B. Likelihood of Irreparable Harm

■ Petitioner argues it has met its burden in establishing a likelihood of irreparable harm by presenting evidence that without the relief requested, Respondent's conduct would "weaken the Union and collective bargaining process so severely, that the future Board decision will be meaningless." Doc. 50 at 9. Respondent argues there has been no showing of a likelihood of irreparable harm since the "individuals terminated have available a 'make whole' remedy." Doc. 57 at 10. The Court

agrees with Petitioner with regards to reinstatement of Polley and the bargaining order.

■ Irreparable harm "is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief. In making the latter determination, inferences from the nature of the particular unfair labor practice at issue remain available." *Frankl,* 650 F.3d at 1362. Indeed, under Ninth Circuit precedent, "a likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances." *Id.* at 1363. As discussed above, Petitioner met his burden in establishing Polley's termination violated § 8(a)(3). Petitioner's witnesses also testified that Respondent's employees have expressed their fear that they will be fired and, for that reason, have discontinued their support for the Union. Sample also testified that several employees withdrew from the volunteer organizing committee formed by Sample and Polley, and no authorization cards for employees in the unit were collected after March 19, 2014. *See* PX 24, 25. Petitioner has therefore met his burden in establishing a likelihood of irreparable harm without reinstatement of Polley and a *Gissel* bargaining order.[8] However, because Petitioner has not demonstrated Forrest was central to any union activity, Petitioner has failed to show irreparable harm without Forrest's reinstatement. *Cf. Sampson v. Murray,* 415 U.S. 61, 90–91, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

---

8. Respondent's argument regarding the availability of a "make whole" remedy for Polley is unconvincing. Making Polley whole by paying him for any loss of wages he may have suffered would not address the fears other employees may now have that continued union activity might lead to their own termination. *See Phelps Dodge Corp. v. N.L.R.B.,* 313 U.S. 177, 204, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (defining "make whole" remedy).

## C. Balance of Hardships and Public Interest

Petitioner argues the balance of hardships tips strongly in his favor, as "no evidence of any hardship to Respondent exists." Doc. 50 at 10. Respondent argues the reinstatement is not necessary to cure any of the hardships alleged here and the mandatory bargaining order is directly contrary to that of the election result. Doc. 52 at 15. Again, the Court agrees with Petitioner.

■ "[I]n considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the alleged[ ] unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority." *Frankl*, 650 F.3d at 1365 (citing *Miller*, 19 F.3d at 460). "For that reason, the District Court's determination that the Regional Director had shown likely irreparable harm to the collective bargaining process meant that there was also considerable weight on his side of the balance of the hardships." *Id.* at 1365.

Petitioner has shown likely irreparable harm to the bargaining process and therefore also demonstrated the balance of hardships tips in his favor. *See id.* at 1365. Further, an interim *Gissel* bargaining order is not permanent, and the costs associated with collective bargaining is "a burden that falls on both parties." *Scott ex rel. N.L.R.B.*, 241 F.3d at 669. And any agreement reached between the parties under such a temporary order can contain "a condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a final bargaining order remedy." *See, e.g., Kaynard for & on Behalf of N.L.R.B. v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1054 (2d Cir.1980). Respondent's argument that the *Gissel* order is directly contrary to the election result is unconvincing, as the *Gissel* order may be granted only upon showing of likelihood that Respondent's alleged violations of the NLRA "impeded the election process." *See Scott*, 241 F.3d at 662.

Respondent alleges reinstating Polley would be unsafe, and because his Southwest Gas card was revoked, "it would be great hardship ... to employ a locator who has no ability to do any work." Doc. 52 at 15. However, Eggli testified to a practice of employing workers who locate solely for non-Southwest Gas facilities. And Respondent has not clarified why Polley's reported damage in March 2014, in which no gas leaked from the line, made him more unsafe than the other two reported damages which did cause gas leakage, but for which he was not terminated. Polley is a well-trained employee, and there thus appears no harm to Respondent in reemploying him on an interim basis.

Similarly, Petitioner has met his burden to establish granting relief is in the public interest. First, "[i]n § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Frankl*, 650 F.3d at 1365 (citing *Miller*, 19 F.3d at 460). Thus, if Petitioner "makes a strong showing of likelihood of success and of likelihood of irreparable harm, [he] will have established that preliminary relief is in the public interest." *Id.* at 1365. Further, Respondent's only argument to the contrary is that Polley would put the public at risk because he is unsafe. However, as discussed above, Polley does not appear to be an unusual safety risk compared to all the other employees and in the context of the evidence presented. Respondent's argument therefore fails.

In light of the above analysis, it appears Petitioner has met his burden of establish-

ing he is likely to succeed on the merits with regard to Polley's termination and the *Gissel* order, he is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in his favor, and an injunction is in the public interest. It thus appears there is sufficient basis to establish temporary injunctive relief is "just and proper." Petitioner's request for relief will therefore be granted, with the exception of reinstatement of Forrest, for which Petitioner failed to meet his burden.

Accordingly,

**IT IS ORDERED** Petitioner's Petition for a Temporary Injunction Under Section 10(j) of the National Labor Relations Act **(Doc. 1)** is **GRANTED IN PART.**

**IT IS FURTHER ORDERED** Respondent, its officers, agents, servants, representatives, successors, and assigns, and all persons acting in concert with it or them, be, and they hereby is, enjoined and restrained from:

(a) soliciting employee complaints and grievances, promising its employees increased benefits and improved terms and conditions of employment if they refrain from union organizational activity;

(b) threatening employees with unspecified reprisals if they select the Union as their bargaining representative;

(c) threatening employees with removal of paid holidays if they select the Union as their bargaining representative;

(d) threatening employees with unspecified reprisals by informing them that they are not eligible to vote in the union election;

(e) granting wage increases to employees because of their Union or concerted activity, and to discourage employees from engaging in these activities;

(f) reinstating paid holidays because of employees' Union or concerted activity, and to discourage employees from engaging in these activities;

(g) ordering and announcing delivery of new equipment for its employees because of their Union or concerted activity, and to discourage employees from engaging in these activities;

(h) discharging employees because of their Union or concerted activity;

(i) disciplining and discharging employees because of their Union activities, sympathies, or support;

(j) failing and refusing to recognize and bargain in good faith with the International Brotherhood of Electrical Workers, Local 387, AFL–CIO, as the exclusive collective-bargaining representative of employees in the following unit:

All full-time and regular part-time locate technicians and splice technicians who work out of Respondent's Phoenix, Arizona facility, but excluding all other employees, gas shut off and gas starter technicians, maintenance employees, office clericals, guards, managers and supervisors as defined in the Act.

(k) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them under § 7 of the National Labor Relations Act.

**IT IS FURTHER ORDERED** Respondent, its officers, agents, servants, representatives, successors, and assigns, and all persons acting in concert with it or them, pending the final disposition of the matters involved herein pending before the Board and to the extent that it has not already done so, shall take the following affirmative actions:

(a) Within five (5) days of the Court's issuance of this Order, offer Daniel Polley (Polley), in writing, immediate reinstate-

ment to his former respective positions, and if such job no longer exists, to a substantially equivalent position, without any loss to his seniority rights or any other privileges;

(b) Within fourteen (14) days of the Court's issuance of this Order, remove from its files, any and all records of its suspension and discharge of Polley, and within three (3) days thereafter, notify Polley, in writing that this was done, and that the material removed will not be used as a basis for any future personnel action against him or referred to in response to any inquiry from any employer, employment agency, unemployment insurance office, or reference seeker, or otherwise used against him;

(c) Post copies of this Order at Respondent's facility, as well as translations of this Order in languages other than English as necessary to ensure effective communication to Respondent's employees as determined by the Regional Director, said translations to be provided to Respondent by the Regional Director, in all places where notices to its employees are normally posted; maintain these postings during the Board's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its facilities to monitor compliance with this posting requirement;

(d) Within ten (10) days of the Court's issuance of this Order, hold a meeting or meetings at which this Order is to be read to the employees by Jim Bourazak, and in the presence of an agent of the Board, to all employees employed by Respondent at Respondent's facility, including at multiple meetings and in other languages, if necessary as determined by the Regional Director, to ensure that it is read aloud to all employees;

(e) Recognize the Union as the collective-bargaining representative of the Unit;

(f) Bargain in good faith with the Union with respect to rates of pay, wages, hours of work, and other conditions of employment, and if an understanding is reached, embody such understanding in a signed agreement; and

(g) Within twenty days of the Court's issuance of this Order, submit to the Court and the Regional Director for Region 28 of the Board a sworn affidavit from a responsible agent of Respondent stating, with specificity, the manner in which Respondent has complied with the terms of this Order.